GAIL FICKLE, BOTH INDIVIDUALLY AND AS PARENT AND GUARDIAN OF
JACOB WAGNER, APPELLEE AND CROSS-APPELLANT, V. STATE OF
NEBRASKA, APPELLANT AND CROSS-APPELLEE.

735 N.W.2d 754

Filed July 20, 2007. No. S-04-1250.

Jon Bruning, Attorney General, Michele M. Lewon, and Matthew F. Gaffey for appellant.

Douglas J. Peterson and Joel Bacon, of Keating, O'Gara, Nedved & Peter, P.C., L.L.O., for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## I. NATURE OF CASE

Jacob Wagner was seriously injured when the car he was driving collided with a semitrailer truck at an intersection controlled by a traffic signal. His mother, Gail Fickle, sued the State of Nebraska under the State Tort Claims Act, Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 1996). She alleged that the accident was caused by a malfunction of the traffic signal, which displayed green lights in conflicting directions. Following a bench trial, a judgment was entered against the State. The issues in this appeal are whether the State had notice of the alleged malfunction and, if so, whether the State corrected the malfunction within a reasonable time. On cross-appeal, Fickle challenges the amount of the awards for economic and noneconomic damages.

## II. SCOPE OF REVIEW

A district court's findings of fact in a proceeding under the State Tort Claims Act will not be set aside unless such findings

are clearly erroneous. *Hradecky v. State*, 264 Neb. 771, 652 N.W.2d 277 (2002).

■ Whether the allegations made by a plaintiff constitute a claim under the State Tort Claims Act or whether the allegations set forth a claim that is precluded by the exemptions set forth in the act are questions of law. See, *Blitzkie v. State*, 241 Neb. 759, 491 N.W.2d 42 (1992); *Hammond v. Nemaha Cty.*, 7 Neb. App. 124, 581 N.W.2d 82 (1998). An appellate court has an obligation to reach its conclusions on these questions independent from the conclusions reached by the trial court. *Blitzkie v. State, supra.*

■ The amount of damages awarded in a case under the State Tort Claims Act is a matter solely for the finder of fact, whose action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of damages proved at trial. *Woollen v. State*, 256 Neb. 865, 593 N.W.2d 729 (1999).

## III. FACTS

Shortly after 10 p.m. on February 14, 1999, Wagner was driving a car southbound on Nebraska Highway 15 in Colfax County. At approximately the same time, a semitrailer truck owned by Metz Baking Company (Metz) was westbound on U.S. Highway 30. The two vehicles collided at the intersection of Highways 15 and 30 in Schuyler, Nebraska, which was controlled by a traffic signal. The semitrailer truck struck the driver's side of Wagner's car, and Wagner was seriously injured.

In her individual capacity and as Wagner's parent and guardian, Fickle sued the city of Schuyler, the county of Colfax, Metz, and the State. The city, the county, and Metz were dismissed from the action before trial. The record reflects that Fickle entered into settlement agreements with the city and Metz. There is no indication whether a settlement agreement or other release was reached with the county, and no such information was presented to the district court.

Fickle presented evidence that at the time of the accident, the traffic signal was displaying green lights for both southbound and westbound traffic. Evidence showed that in the 6 months preceding the accident, the city of Schuyler, the county

of Colfax, and the State had received complaints from citizens regarding conflicting green lights at the same intersection.

As a result of the accident, Wagner was in a coma for 19 days. He was subsequently transferred to a rehabilitation hospital that specialized in treating traumatic brain injuries. Wagner experienced problems with vision, respiration, blood pressure, and the ability to communicate. After 8 months of physical therapy, Wagner could communicate by blinking his eyes and vocalizing a few words.

Wagner continues to have cognitive and visual impairment and requires a wheelchair. He has significant spasticity in his arms and legs. It is unlikely that his condition will improve. Because Wagner's family found it difficult to meet his needs at home, he resides in Village Northwest Unlimited, an intermediate care facility in Sheldon, Iowa. The facility treats persons with severe brain injuries. This type of facility provides Wagner with the best chance to maintain the functioning level he achieved at the rehabilitation hospital. He will probably need to live at this or a similar facility for the remainder of his life. His life expectancy from the time of trial was approximately 40 years.

The district court concluded that the State was negligent in the operation, maintenance, inspection, and repair of the traffic signal and that this negligence proximately caused the collision in which Wagner was injured. The court found that the negligence of Wagner, the city of Schuyler, and Metz also contributed to the accident. The court assigned 10 percent of the negligence to Wagner, 10 percent to Metz, 15 percent to the city, and 65 percent to the State.

The district court found that Fickle, in her individual capacity, had incurred economic damages of $1,013,417.01. In her representative capacity for Wagner, Fickle's economic damages were $3.5 million, and her noneconomic damages were $500,000. The court then took into account the percentages of negligence assigned to Wagner and the other actors and considered Fickle's settlements with Metz and the city of Schuyler. Judgment was entered against the State for economic damages in the amount of $3,928,575.31 and noneconomic damages in the amount of $325,000.

The State appealed, and Fickle has cross-appealed. Additional facts will be set forth below as they are relevant for analyzing the issues presented.

## IV. ASSIGNMENTS OF ERROR

The State claims, rephrased, that the district court erred (1) in denying the State immunity from liability under § 81-8,219, (2) in finding that the State was liable for Wagner's injuries, and (3) in permitting Fickle's expert to testify at trial.

On cross-appeal, Fickle claims that the district court's awards for economic and noneconomic damages were inadequate.

## V. ANALYSIS

### 1. STATE'S APPEAL

#### (a) Question of Sovereign Immunity

The first question is whether this action against the State was precluded by exemptions set forth in the State Tort Claims Act. At all times relevant to this case, the applicable statute provided:

> The State Tort Claims Act shall not apply to:
>
> . . . .
>
> (9) Any claim arising out of the malfunction, destruction, or unauthorized removal of any traffic or road sign, signal, or warning device unless it is not corrected by the governmental entity responsible within a reasonable time after actual or constructive notice of such malfunction, destruction, or removal.

§ 81-8,219.

Under this provision, the State is immune from liability against allegations of a malfunctioning traffic signal unless the malfunction was not corrected by the State within a reasonable time after it received actual or constructive notice of the problem. Whether the allegations made by a plaintiff present a claim that is precluded by exemptions set forth in the State Tort Claims Act is a question of law. See, *Blitzkie v. State*, 241 Neb. 759, 491 N.W.2d 42 (1992); *Hammond v. Nemaha Cty.*, 7 Neb. App. 124, 581 N.W.2d 82 (1998). An appellate court has an obligation to reach its conclusion on this question independent from the conclusion reached by the trial court. *Blitzkie v. State*,

*supra.* To determine whether Fickle's action was precluded by the traffic-signal exemption in the State Tort Claims Act, the district court had to determine that the State had notice of a malfunction in the traffic signal but did not correct the malfunction within a reasonable time. On appeal under the State Tort Claims Act, the findings of the trial court will not be disturbed unless clearly wrong. *Blitzkie v. State, supra.*

### (i) Notice of Signal Malfunction

We first consider whether the State had actual or constructive notice that the traffic signal had malfunctioned. The State argues it had no notice of a malfunction on February 14, 1999, the date of the accident. The State claims it was contacted only twice about conflicting green lights at the intersection in the months preceding the accident. Fickle asserts that the State received several complaints concerning the malfunction of the traffic signal before and immediately after the accident.

Evidence presented at trial showed that the State was notified of conflicting green lights at the intersection of Highways 15 and 30. Joseph Sobota reported conflicting green lights from the traffic signal on September 22, 1998. Sobota's call was confirmed by Robert Simard, a traffic signal engineer for the State. The telephone log of the Colfax County Sheriff's Department recorded that on October 16, a person named "Chrissy" reported that the traffic signal was displaying red lights for westbound and southbound traffic and green lights for eastbound and northbound traffic. The log reflects that the sheriff's department notified the State about the signal problem. This call was also confirmed by Simard at trial.

Brenda Rist, a dispatcher for the sheriff's department and a manager for the Gas 'N Shop located on the corner of Highways 15 and 30, testified that on various occasions in 1998 and 1999, she had observed that the lights on the traffic signal in question were all red or all green. She observed conflicting green lights numerous times before the accident occurred. She contacted the State once or twice before the accident.

Eugene Sindelar traveled through the intersection on a daily basis. Before the accident, he observed many times that the lights on the traffic signal were green in conflicting directions.

On September 5, 1998, he was traveling westbound on Highway 30 and as he approached the intersection, he noticed a semi-trailer truck coming from the south on Highway 15 that was not going to stop. Sindelar applied the brakes of his vehicle in order to miss the truck, and after he stopped, he noticed that the traffic signal was green for both directions. Sindelar testified that he contacted the city several times and the State once about the recurring problem. He was told by the State that it was aware of the situation and that it would be taken care of.

Thomas McCoy, a district maintenance superintendent for Nebraska's Department of Roads, testified he remembered having a telephone conversation before February 14, 1999, in which he was told about conflicting green signals at the intersection. He had no record of whether anyone from the State responded to that complaint, and he admitted that the State had received other calls from people complaining about conflicting green lights displayed at the intersection. A coordinated investigation to repair the signal was not initiated because the lights appeared to work properly each time an employee of the State observed the traffic signal.

Warren Racely, a highway maintenance superintendent with the State, testified that he remembered seeing a notice about conflicting green lights at the intersection in the latter part of 1998 or early 1999. Keith Rabe, an electronics technician for the State, was responsible for complaint calls and troubleshooting for malfunctioning traffic signals. He testified to having a discussion with someone before February 14, 1999, regarding conflicting green lights at the intersection in question.

The State asserts there was no evidence that it had either actual or constructive notice of a conflicting green signal at the Schuyler intersection on February 14, 1999. The State claims that no defect to the signal was apparent on February 14 and that no person or agency informed the Department of Roads that conflicting green signals were being displayed on that date. The State contends it had no actual notice of the malfunction on that date and therefore had no opportunity to respond to or correct the malfunction.

The State contends it was contacted only twice regarding conflicting lights at the intersection and that those calls were

made 4 to 5 months before the accident. The State claims that each time a report of conflicting green lights was received, no defect was found in the signal or any of its components. Maintenance on the signal was last performed before the accident on January 12, 1999, and the signal was working properly. The State emphasizes that no malfunctions were reported between January 12 and the date of the accident and argues that the complaints 4 to 5 months before the accident were too remote in time to support an allegation of conflicting green lights on February 14. Therefore, the State argues that it did not have notice of any malfunction of the signal and that the district court should have found the State immune from liability under § 81-8,219(9).

Whether the State had notice of the malfunction of the traffic signal on February 14, 1999, does not exempt the State from liability. It is clear the State had notice on numerous occasions prior to that date that the traffic signal in question was malfunctioning.

### (ii) Correction of Signal Malfunction

Once it is found that the State had notice of the malfunction, the question becomes whether the malfunction was corrected within a reasonable time. The State maintains it made reasonable efforts to ascertain whether the traffic signal was malfunctioning but that the signal did not display conflicting green lights whenever State employees checked on the problem. The State had corrected other problems with the traffic signal during the 6 months preceding the accident. For example, the conflict monitor was replaced in August 1998 due to a DC-voltage failure. A conflict monitor is a component in a traffic-signal cabinet that detects improper electrical current sent between the other components. The traffic-signal cabinet at the intersection was designed so that if conflicting current was detected by the conflict monitor, the traffic signal was put into "flash" mode. The State also corrected a problem with a defective loop detector that caused the red lights to stay on too long.

McCoy, a district maintenance superintendent for the Department of Roads, testified that someone from the State checked the signal in response to all complaints. He did not

believe that the lights could have been green and conflicting at the time of the accident because each time the State responded to a complaint, "everything was functioning normally." Racely, a highway maintenance superintendent, testified that the State had checked the traffic signal after receiving complaints. He did not have a key to access the traffic-signal cabinet, but he visually inspected the signal after complaints and found it to be working properly. This evidence establishes that the State attempted to fix the malfunctioning traffic signal.

Fickle presented numerous eyewitness reports of conflicting green lights before, during, and after the accident. Several of such instances have been detailed previously.

Two eyewitnesses testified that the traffic signal was displaying conflicting green lights the evening of February 14, 1999, before the accident. John Gardner, Jr., who lived in Schuyler, stated that he traveled through the intersection between 5 and 6 p.m. As he approached and entered the intersection from the west, his light was green. After entering the intersection, he nearly collided with another car coming from the south. After Gardner stopped, he could see that both lights were green.

Rist had driven to her job at the Gas 'N Shop that evening between 9:30 and 9:45 p.m. When she arrived at the store, she observed that the traffic signal was displaying green in all directions. She reported the situation to police officers who were in the store around 10 p.m. About the same time, Gardner was seated at a table in the Gas 'N Shop and was looking out the window. He could see both the westbound light for Highway 30 and the southbound light for Highway 15. He saw the collision and noticed that both lights were green at the time.

Michelle Egr testified that between 6 and 6:30 a.m. the day after the accident, she approached the intersection from the south and could see that the light was green, but she also saw eastbound and westbound vehicles on Highway 30 traveling through the intersection. She slowed down because she "obviously knew that there was something not right." By the time Egr arrived at the intersection, her light had changed to red, and she stopped. When her northbound light again turned green, Egr was "shocked" to find that an eastbound semitrailer truck passed through the intersection. She looked at the traffic signal

and discovered that both the northbound and eastbound lights were green.

The State was not immune from liability under § 81-8,219(9) if it did not correct the malfunction of the traffic signal within a reasonable time after having actual or constructive notice of such malfunction. An attempt to correct the malfunction does not exempt the State from liability. The evidence and the reasonable inferences therefrom establish that the State failed to repair the defective traffic signal.

The district court was not clearly wrong in its implicit finding that the State had notice of the malfunctioning traffic signal but did not correct the malfunction within a reasonable time.

### (b) Liability of State

■ The State next claims the district court erred in holding the State liable for the injuries sustained by Wagner on February 14, 1999. In order to recover in a negligence action brought under the State Tort Claims Act, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages. *Bartunek v. State*, 266 Neb. 454, 666 N.W.2d 435 (2003).

### (i) Duty

■ The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff. *Spear T Ranch v. Nebraska Dept. of Nat. Resources*, 270 Neb. 130, 699 N.W.2d 379 (2005). The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id.* The State does not assert that it owed no duty to Wagner with regard to the traffic signal; rather, the State contends it did not breach any duty owed.

■ Concerning highways in general, the State has a duty to use reasonable and ordinary care in the construction, maintenance, and repair of its highways so that they will be reasonably safe for the traveler using them while exercising reasonable and ordinary care and prudence. See *Malolepszy v. State, ante* p. 313, 729 N.W.2d 669 (2007). Under the plain language of § 81-8,219(9), the State had a duty to correct the malfunctioning traffic signal within a reasonable time after receiving

notice of the defect. Foreseeability is a factor in establishing a defendant's duty. *Woollen v. State*, 256 Neb. 865, 593 N.W.2d 729 (1999). It was clearly foreseeable that an automobile accident would occur at an intersection where the traffic signal was showing green lights in conflicting directions.

### (ii) Breach

Although in its order the district court did not expressly discuss duty and breach, the court found that Fickle had met the burden of proof on her negligence claim. Therefore, the court implicitly found that the State breached its duty to correct the malfunctioning traffic signal within a reasonable time after notice of such malfunction.

The State's argument that it did not breach such duty because the components of the traffic signal were regularly maintained is without merit. Although the signal's specifications may have complied with the standards in the traffic-engineering industry, sufficient evidence demonstrated that the signal malfunctioned, resulting in the accident. The State's duty was to correct the malfunctioning traffic signal within a reasonable time after receiving notice of the problem. The State failed to do so and thus breached its duty.

### (iii) Causation

Fickle met the burden of proof to show that the malfunctioning traffic signal was the proximate cause of the traffic accident. A proximate cause is a cause that produces a result in a natural and continuous sequence, and without which the result would not have occurred. *Baldwin v. City of Omaha*, 259 Neb. 1, 607 N.W.2d 841 (2000). Determination of causation is ordinarily a matter for the trier of fact. *Id.* When reviewing the sufficiency of the evidence to sustain a judgment, we are mindful that every controverted fact must be resolved in favor of the successful party, and such party is entitled to the benefit of every inference that can reasonably be deduced from the evidence. See *id.*

The State relies on certain testimony which it claims established that the traffic signal did not malfunction at the time of the accident. Accordingly, the State argues that the traffic signal could not have proximately caused the accident. The

district court heard the witnesses, considered the evidence, and found against the State on this issue. In a bench trial of a law action, the court, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Sherrod v. State*, 251 Neb. 355, 557 N.W.2d 634 (1997).

Giving Fickle, as the successful party, the benefit of every inference that can reasonably be deduced from the evidence, the evidence is sufficient to support the district court's finding that the negligence of the State was the proximate cause of the accident and Wagner's resulting injuries. The court was not clearly wrong in so finding.

### (iv) Comparative Negligence

The State argues that its negligence did not proximately cause Wagner's injuries because the negligence of Wagner and the dismissed parties combined to proximately cause the accident. Thus, the State contends the district court erred in allocating only 10 percent of the negligence to Wagner, 10 percent to Metz, and 15 percent to the city of Schuyler.

The State argues that credible evidence was presented to support an apportionment of more than 10 percent of the negligence to Wagner. The State relies on cases in which this court has declared that drivers must "maintain a proper lookout and have the duty to see what is in plain sight." See, e.g., *Kimberling v. Omaha Public Power Dist.*, 225 Neb. 744, 746, 408 N.W.2d 269, 271 (1987). According to the State, Wagner's negligence was at least 50 percent because he failed to keep a proper lookout at the intersection and entered the intersection when it was clearly unsafe to enter—i.e., when the semitrailer truck was crossing the intersection.

The State also argues that parties dismissed from the action were negligent and that their negligent acts, in addition to Wagner's, represented the total proximate cause of the accident. Evidence showed that the Colfax County Sheriff's Department and the Schuyler Police Department had received complaints about the traffic signal's displaying conflicting green lights, but they failed to report all the complaints to the State. The court found that the negligence of Metz and the city

(both dismissed from the action based on settlements) contributed to the accident.

Evidence was presented by Fickle indicating that the conflicting green lights, attributed to the State's negligence, played a greater role in the accident than did other negligent acts. Conflicting green lights at an intersection create a much more dangerous condition than if the signal displays all red lights. Ronald Hensen, a civil engineer who specialized in traffic engineering, testified that a situation in which green lights are displayed in conflicting directions is "clearly the most egregious possibility . . . for a failure of intersection traffic control." He explained that when an intersection is controlled by a traffic signal, the responsibility for "who yields to who[m]" is taken away from the drivers and it is assigned to the equipment. One driver assumes that if he or she has a green light, the other does not. When two lights display green in conflicting directions, it "sets up a situation where both drivers believe they are assigned the right of way."

The district court concluded that Wagner was negligent and that in relation to the negligence of the other actors, his negligence was 10 percent responsible for the accident. The judgment against the State for damages was reduced accordingly. It is well settled that plaintiffs are contributorily negligent if (1) they fail to protect themselves from injury, (2) their conduct concurs and cooperates with the defendant's actionable negligence, and (3) their conduct contributes to their injuries as a proximate cause. *Baldwin v. City of Omaha*, 259 Neb. 1, 607 N.W.2d 841 (2000). To entitle a defendant to judgment under the comparative negligence statutory scheme, the defendant must prove that any contributory negligence chargeable to the plaintiff is equal to or greater than the total negligence of all persons against whom recovery is sought. *Id.* See Neb. Rev. Stat. § 25-21,185.09 (Reissue 1995).

Because the purpose of comparative negligence is to allow triers of fact to compare relative negligence and to apportion damages on that basis, the determination of apportionment is solely a matter for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by credible evidence and bears a reasonable relationship to

the respective elements of negligence proved at trial. *Baldwin v. City of Omaha, supra.* We conclude that the district court's apportionment of damages was supported by credible evidence and bore a reasonable relationship to the negligence proved at trial.

### (v) Failure to Use Seatbelt

As part of its argument that the district court improperly allocated negligence in determining causation, the State asserts that the damages should have been reduced by 5 percent because Wagner allegedly was not wearing a seatbelt at the time of the accident. Under Neb. Rev. Stat. § 60-6,273 (Reissue 2004), evidence that a person was not wearing a seatbelt is admissible only as evidence concerning the mitigation of damages and cannot be used with respect to the issue of liability or proximate cause. The failure to use a seatbelt cannot be used to allocate the percentage of negligence to a party. And the State did not assign as error the district court's award of damages. Errors argued but not assigned will not be considered on appeal. *County of Sarpy v. City of Gretna, ante* p. 92, 727 N.W.2d 690 (2007).

### (vi) Damages

No real dispute exists as to whether Fickle sufficiently proved damages. In her cross-appeal, Fickle challenges the *amount* of damages awarded, but that issue will be addressed later in this opinion.

## (c) Admission of Expert Testimony

The State next asserts that the district court abused its discretion in permitting Fickle's expert, Hensen, to testify. An appellate court reviews the record de novo to determine whether a trial court has abdicated its gatekeeping function. *Zimmerman v. Powell*, 268 Neb. 422, 684 N.W.2d 1 (2004).

### (i) Procedural Background Involving Fickle's Expert

Hensen, a civil engineer specializing in traffic engineering, testified as an expert for Fickle. During the discovery phase of this litigation, Hensen opined that the conflicting green lights could have been caused by a low-voltage situation. At trial, the State filed a motion to prevent Hensen from testifying about

certain subjects, and a separate hearing was held. The State asked the district court to preclude Hensen from testifying that (1) a voltage failure occurred, (2) low voltage caused the traffic signal to display conflicting green lights, (3) the signal cabinet should have been replaced, (4) the State and the city of Schuyler lacked a coordinated policy to address problems with the traffic signal, and (5) the State had a duty to correct the problem of conflicting green lights. The court concluded that Fickle could adduce testimony from Hensen but noted that its ruling did not preclude the State from objecting to Hensen's testimony as deemed necessary.

### (ii) Relevant Law Governing Expert Testimony

When a court is faced with a decision regarding the admissibility of expert opinion evidence, the trial judge must determine at the outset, in accordance with Neb. Evid. R. 702, whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). This entails a preliminary assessment to determine whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.*

A trial court adequately demonstrates that it has performed its gatekeeping duty in determining the reliability of expert testimony when the record shows (1) the court's conclusion whether the expert's opinion is admissible and (2) the reasoning the court used to reach that conclusion, specifically noting the factors bearing on reliability that the court relied on in reaching its determination. *Zimmerman v. Powell, supra.*

### (iii) Trial Testimony by Fickle's Expert

We note that Hensen did not testify at trial with regard to some of the subjects that constitute the basis for the State's assigned error. The State argues that Hensen should have been precluded at trial from testifying about the cause of the alleged conflicting green lights and about insufficient coordination between the City of Schuyler and the State. But no such testimony was elicited from Hensen at trial.

Hensen testified about the adequacy of the State's response to the complaints it received with regard to the traffic signal. He also testified concerning whether the State should have replaced the signal cabinet. Hensen's testimony was based on his knowledge and experience in traffic engineering. He opined that the State's response to the complaints was inadequate. Regarding the keeping of records pertaining to such complaints, Hensen also relied on a publication by the Institute of Transportation Engineers. The State has not taken issue with the publication. Hensen testified as to his extensive knowledge and experience in traffic engineering. Since 1979, Hensen had worked full time as a consultant to various public agencies, including state road departments and municipalities.

*(iv) District Court's Gatekeeping Duty*

The State argues that the district court did not make adequate findings on the record with regard to the admissibility of Hensen's testimony. At a hearing concerning Hensen's proposed testimony, the court did not specifically and expressly make findings. However, the record shows the court concluded that Hensen's testimony was admissible, see *Zimmerman v. Powell*, 268 Neb. 422, 684 N.W.2d 1 (2004), and the court left open the opportunity for the State to object at trial. During trial, the court permitted Hensen to testify that the signal cabinet should have been replaced. The record indicates, in accordance with *Zimmerman v. Powell*, that the court expressed its reason for allowing Hensen to testify and the factor considered by the court bearing on the reliability of his testimony: Hensen's testimony was based on his expertise, and he was "entitled to rely on his experience in the field to make the recommendation that the cabinet be pulled."

 A trial court may not abdicate its gatekeeping duty under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), in a bench trial, but the court is afforded more flexibility in performing this function. See, generally, *Seaboard Lumber Co. v. U.S.*, 308 F.3d 1283 (Fed. Cir. 2002) (holding that while concerns underlying *Daubert* requirements are of lesser import in bench

trials, *Daubert* standards must nevertheless be met); *City of Owensboro v. Adams*, 136 S.W.3d 446 (Ky. 2004) (noting that *Daubert* is applied in procedurally different manner in bench trial in that trial court often admits evidence first and then disregards it upon deciding it is unreliable); *USGen New England v. Town of Rockingham*, 177 Vt. 193, 862 A.2d 269 (2004) (holding that admissibility standards of *Daubert* are required in bench trial but in more relaxed manner). In determining whether an expert's testimony is reliable, a trial court necessarily must first hear the testimony. And we presume that a trial court considers only competent and relevant evidence in rendering its decision. See *Eicher v. Mid America Fin. Invest. Corp.*, 270 Neb. 370, 702 N.W.2d 792 (2005).

Based on a de novo review of the record, we conclude that the district court did not err in admitting Hensen's testimony. When the trial court has not abdicated its gatekeeping function, an appellate court reviews the trial court's decision to admit or exclude the evidence for an abuse of discretion. *Zimmerman v. Powell, supra.* The district court did not abuse its discretion in permitting Fickle's expert to testify.

For the reasons stated above, we conclude that the State's appeal is without merit and affirm the district court's judgment holding the State liable in this matter under the State Tort Claims Act. We now turn to the cross-appeal.

## 2. FICKLE'S CROSS-APPEAL

The district court found that Fickle, in her individual capacity, had incurred economic damages of $1,013,417.01. The court found that in her representative capacity for Wagner, Fickle had sustained economic damages of $3.5 million and noneconomic damages for pain and suffering in the amount of $500,000. The issue is whether these sums were adequate.

The amount of damages awarded in a case under the State Tort Claims Act is a matter solely for the finder of fact, whose action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of damages proved at trial. *Woollen v. State*, 256 Neb. 865, 593 N.W.2d 729 (1999). We must determine whether the award bears a reasonable relationship to the damages proved at trial.

## (a) Future Economic Damages

Fickle asserts that the amount of future economic damages awarded was inadequate. At the time of trial, Wagner was 20 years old. George Wolcott, a neurologist, testified that Wagner could expect to live "into his 60's." The evidence established that Wagner's life expectancy from the time of trial was approximately 40 years. Fickle claims that Wagner's future medical care and loss of wages require a much greater award than was given by the district court.

### (i) Future Medical Care

The evidence established that Wagner's future medical expenses (including the cost of residential care at Village Northwest Unlimited) would be between $193,610 and $198,355 per year. This range did not reflect inflation or future increases in cost. These amounts were shown in a "Life Care Plan" compiled by Robin Welch-Shaver. Welch-Shaver has a bachelor of science degree in nursing and is a certified life care planner. The plan was formulated using information from Fickle, Wagner, the providers at Village Northwest Unlimited, and Drs. Wolcott, Lester Sach, Sarah Zoelle, and Lyal Leibrock.

The life care plan considered that Wagner would remain a resident of Village Northwest Unlimited, which provided appropriate treatment, including 24-hour nursing care, physical and occupational therapy, cognitive-skills training, and other services. The plan also was based upon the fact that Wagner would always need a residential setting in which he would receive services similar to those he was receiving from Village Northwest Unlimited. The cost associated with Wagner's need for this residential setting was $462 per day, which equated to an annual cost of $168,630.

Evidence at trial suggested that Wagner had been receiving Medicaid payments and that Village Northwest Unlimited was charging him at the Medicaid rate, which was lower than the rate paid by private parties. The State argues that the lower Medicaid rate should have been considered in calculating damages instead of the private-party rate. This argument has no merit.

 The private-party rate, not the Medicaid rate, is the proper rate to use in calculating Wagner's future medical expenses. Under the collateral source rule, the fact that the party seeking recovery has been wholly or partially indemnified for a loss by insurance or otherwise cannot be set up by the wrongdoer in mitigation of damages. *Mahoney v. Nebraska Methodist Hosp.*, 251 Neb. 841, 560 N.W.2d 451 (1997). Social legislation benefits, including payments by Medicare and Medicaid, are excluded by the collateral source rule. See, *Bynum v. Magno*, 106 Haw. 81, 101 P.3d 1149 (2004) (holding that collateral source rule prohibited reducing patient's damages award to reflect discounted Medicare and Medicaid payments); Restatement (Second) of Torts § 920A, comment *c.* (1979). Moreover, once Fickle receives the judgment awarded in this case, Wagner may no longer be eligible for Medicaid (or Village Northwest Unlimited's Medicaid rate), because eligibility standards take into account the resources available to a Medicaid applicant or recipient. See *Wilson v. Nebraska Dept. of Health & Human Servs.*, 272 Neb. 131, 718 N.W.2d 544 (2006).

The State also claims that certain medical expenses should not be included because they were controverted at trial. For instance, the State points out that Wagner was not required to take the following medications and supplements as a result of the accident: "Aterol," multivitamins, and calcium supplements. The State also asserts that the cost of a motorized wheelchair should not be included as a future medical expense. The State further claims that the standard cost of a minivan should be deducted from the value of a minivan with customization; however, Welch-Shaver testified that it is not a common practice to deduct the base cost of a minivan without modification. Disregarding any adjusted figures for the modified van, we summarize that the State disputes various future medical expenses in the amount of $203,480 and argues that this amount should not be considered in the damages award.

When reviewing the sufficiency of the evidence to sustain a judgment, we are mindful that every controverted fact must be resolved in favor of the successful party, and such party is entitled to the benefit of every inference that can reasonably

be deduced from the evidence. See *Baldwin v. City of Omaha*, 259 Neb. 1, 607 N.W.2d 841 (2000). Giving Fickle the benefit of every inference that can reasonably be deduced from the evidence, Wagner's future medical expenses without inflation are between $7,744,400 and $7,934,200.

### (ii) Future Lost Wages

Evidence showed that Wagner was unable to earn a living in the labor market due to his injuries. At trial, the State contested whether Wagner would have been a skilled laborer. At the time of the accident, Wagner was a high school student who had difficulties in school and whose academic performance was not stellar. He planned to obtain a diploma through GED and pursue training through Job Corps to acquire a skill. Fickle argues that the evidence presented indicated that even if Wagner did not complete vocational training or obtain a diploma through GED, he could have expected to make at least $8 per hour as an unskilled laborer. A laborer working at this rate would earn a minimum of $16,000 per year. Over a period of 40 years, Wagner's earnings would amount to at least $640,000.

The State argues that Wagner's potential earnings should have been based upon the minimum wage. But the State fails to direct us to evidence in the record indicating that minimum wage was all that Wagner could have expected to earn. Therefore, the record supports the fact that Wagner could have expected to earn at least $640,000.

### (iii) Total Future Economic Damages

Giving Fickle the benefit of every inference that can reasonably be deduced from the evidence, the evidence indicated that future medical expenses for Wagner would be between $7,744,400 and $7,934,200 and that future lost wages would be a minimum of $640,000. Thus, without consideration for inflation, the evidence presented at trial established Wagner's future economic damages would be between $8,384,400 and $8,574,200.

### (iv) Reduction to Present Value

The general rule in Nebraska is that an award for future damages must be reduced to its present value. *Cassio v.*

*Creighton University*, 233 Neb. 160, 446 N.W.2d 704 (1989). Present value is the current worth of a certain sum of money due on a specified future date after taking interest into consideration. *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995).

Present value must be determined because the money awarded can be invested and earn interest. A present award should also consider the fact that inflation will increase the expenses incurred by the plaintiff. Although the plaintiff can earn interest, the value of the dollar will decline because of inflation. See, generally, G. Michael Fenner, *About Present Cash Value*, 18 Creighton L. Rev. 305 (1985) (discussing various approaches for determining present value). These factors are left to the judgment of the trial court but should, nevertheless, be considered in the amount of the award.

### (v) Conclusion Regarding Future Economic Damages

We conclude that the evidence supports a finding that Wagner will suffer a much greater amount of future economic damages than was awarded by the district court. Therefore, the award for economic damages did not bear a reasonable relationship to the damages proved at trial.

### (b) Noneconomic Damages

The district court found noneconomic damages in the amount of $500,000. On appeal, the fact finder's determination of damages is given great deference. *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006). An award of damages may be set aside as inadequate when, and not unless, it is so inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. *Brandon v. County of Richardson*, 264 Neb. 1020, 653 N.W.2d 829 (2002).

Wagner sustained a traumatic brain injury. He was comatose for 19 days. He subsequently was transferred to a hospital that specialized in treating such injuries. He was fed by a tube and had difficulty with his vision, respiration, and blood pressure. He received 8 months of physical therapy to reduce the spasticity in his arms and legs and had a "Baclofen pump" surgically implanted in his stomach to deliver medication to relieve

the spasticity. He has ongoing problems with spasticity in his arms and legs.

Wagner has received speech and psychological therapy. Initially, he was able to communicate only by blinking. At the time of trial, he could vocalize a few words. He continues to have cognitive and visual impairment, and his medical progress has reached a plateau. He requires a wheelchair and can speak and communicate only at a modest level. These impairments are likely permanent. Evidence showed that it will be necessary for Wagner to remain in an intermediate-care facility for the remainder of his life, and he will be limited in his abilities to complete simple tasks.

■ Wagner's injuries were catastrophic and permanent, and the award of $500,000 for noneconomic damages does not fairly and reasonably compensate him for his pain and suffering. If an award of damages shocks the conscience, it necessarily follows that the award was the result of passion, prejudice, mistake, or some other means not apparent in the record. *Id.*

■ There is no mathematical formula for the translation of pain and suffering and permanent disability into terms of dollars and cents. *Schaefer v. McCreary*, 216 Neb. 739, 345 N.W.2d 821 (1984). It is a matter left largely to the discretion of the fact finder, which saw the witnesses and heard the evidence. See *id.* Here, the award of noneconomic damages did not bear a reasonable relationship to the injuries Wagner sustained and was the result of a mistake or an error by the court.

## VI. CONCLUSION

The State's appeal is without merit. As to the cross-appeal, the amount of the award for economic damages was significantly lower than the amount shown by the evidence. The awards for economic and noneconomic damages did not bear a reasonable relationship to the elements of the damages proved.

We therefore affirm the judgment of liability against the State, but we reverse the judgment as to damages. The cause is remanded with directions that the district court award economic and noneconomic damages consistent with this opinion.

We direct the court to our interpretation of Neb. Rev. Stat. § 25-21,185.11 (Reissue 1995) in *Tadros v. City of Omaha, ante* p. 935, 735 N.W.2d 377 (2007).

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.