275 Neb. 757
AMANDA C., BY AND THROUGH GARY RICHMOND, NATURAL PARENT AND NEXT FRIEND, APPELLEE,
v.
KELLY CASE, APPELLANT.
No. S-06-1097.
Supreme Court of Nebraska.
Filed May 23, 2008.
Jon Bruning, Attorney General, and Michael J. Rumbaugh for appellant.
Monte L. Neilan, of Douglas, Kelly, Ostdiek, Bartels & Neilan, P.C., for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
HEAVICAN, C.J.

I. INTRODUCTION
Amanda C., by and through her natural father, Gary Richmond, sought damages, costs, and attorney fees from Kelly Case, an employee of the Nebraska Department of Health and Human Services (DHHS). The suit was filed against Case in her personal capacity based on her alleged interference with Amanda's constitutional right to a relationship with Richmond. The district court for Kimball County granted summary judgment in favor of Amanda on the issue of Case's "liability" and held a bench trial to determine damages. The court ultimately awarded Amanda $150,000 in damages, $53,437.50 in legal fees, and $11,260.03 in costs and expenses. Case now appeals. We affirm for reasons set forth below.

II. BACKGROUND
Richmond and Carol C. married and settled in the Omaha, Nebraska area. While living in Omaha, Richmond and Carol had two children together. For reasons that are not entirely clear from the record, both of these children were taken into DHHS custody at birth. It is clear, however, that Carol suffered from a mental illness, and this may have been a contributing factor. Regardless, both of the children were eventually placed with Carol's father and stepmother, Clyde and Connie C., who also lived in Omaha. Richmond and Carol eventually relinquished their custodial rights to both children.
When Carol became pregnant with Amanda, Richmond and Carol moved from Omaha to Kimball, Nebraska. The move was apparently made to prevent DHHS from seizing Amanda at birth. Amanda was born on July 21, 1987. Approximately 5 years later, a neighbor reported that Carol was abusing Amanda. No allegations of abuse were or have been made regarding Richmond. On July 23, 1993, DHHS took Amanda into its custody.
Initially, Amanda was placed in a foster home in Kimball, where she prospered and had regular visitation with Richmond. It appears, however, that Carol still managed to abuse Amanda, though it is not clear exactly how she did so. Regardless, on June 1, 1995, DHHS placed Amanda with her maternal grandfather and stepgrandmother, Clyde and Connie, in Omaha. Richmond was not consulted about this move. No arrangements were made to allow Richmond to have regular visitation with Amanda. There is some evidence that Richmond did not have a friendly relationship with Clyde and Connie. Once Amanda was relocated to Omaha, her visits with Richmond ceased.
On September 4, 1996, the Kimball County Attorney filed a petition in the county court for Kimball County to terminate Richmond's parental rights. On July 29, 1997, the court appointed Monte Neilan to represent Richmond in the matter. Meanwhile, DHHS representatives began contacting Richmond and asking him to voluntarily relinquish his parental rights. Richmond repeatedly refused these requests. Not long after Neilan was appointed to represent Richmond, the two lost contact for the better part of a year. On May 5, 1998, the juvenile court entered an order stating that Neilan would be excused from the case if Richmond did not immediately contact him. Richmond resumed contact with Neilan a day or two later.
On August 4, 1998, Case, a caseworker at DHHS, was assigned to Amanda's file. As with prior caseworkers before her, Case wanted Richmond to relinquish his parental rights so that Amanda could be formally adopted by Clyde and Connie. To that end, Case spoke with Richmond over the telephone and met with him in person immediately after she was assigned to the case. Richmond initially explained that he was not willing to relinquish his rights. However, he also indicated that he wanted to take Amanda's preferences into account. During their conversations, Case explained that if they could arrange an open adoption, Richmond could still visit Amanda even if he relinquished his parental rights. Case also explained that such visitation opportunities would disappear if Richmond's parental rights were terminated in the proceeding pending in county court.
On August 13, 1998, Case met with Richmond at the DHHS office in Scottsbluff, Nebraska. During the meeting, Case placed a call to Clyde and Connie's residence in Omaha. A conference call was held with Case and Richmond in Scottsbluff and Connie and Amanda in Omaha. During the telephone call, Amanda stated that she wanted to be adopted by Clyde and Connie, since she was in Omaha and Richmond was in Kimball. However, Amanda also stated that she wanted to have contact and visits with Richmond. Promises were madethough it is not clear whether by Case, Connie, or boththat an open adoption would be used. Notably, Case did not inform Neilan, the Kimball County Attorney, Amanda's guardian ad litem, or the county court about any of the above.
After the conference call, Case prepared the documents that, once signed, would divest Richmond of his parental rights over Amanda. Case then contacted Neilan to inform him that she was working with Richmond to secure his relinquishment of parental rights. In response, Neilan sent a letter to Case stating that Richmond did not want to relinquish his parental rights. Case would later claim that she did not receive the letter. Either way, Case avoided further contact with Neilan.
Case then met with Richmond to discuss the relinquishment. Notably, Case once again counseled Richmond regarding the legal ramifications of a relinquishment as opposed to a court-ordered termination of parental rights. In particular, Case explained that relinquishment left open the possibility of visitation with Amanda, whereas termination would not. Case left the relinquishment documents with Richmond and told him to discuss them with his attorney. It is not clear whether Richmond ever did. Once again, Case never notified Amanda's guardian ad litem, the county attorney, or the county court about these meetings.
Case and Richmond met for a final time on August 25, 1998. Case again explained the legal benefits of relinquishment and stated that relinquishment was in Richmond's best interests. Richmond then signed the documents and thereby relinquished his parental rights over Amanda. Case filed the documents with the county court.
In 1999, Richmond sued Case based on the aforementioned sequence of events.[1] Richmond alleged that, among other things, Case engaged in the unauthorized practice of lawand thereby abused her authority as a DHHS employeewhen she counseled Richmond about the legal benefits of relinquishing his parental rights. Richmond alleged that this action deprived him of his substantive due process right to custody of his child and therefore sought relief pursuant to 42 U.S.C. § 1983 (2000).
A jury trial was held on February 6, 2003. The jury found in favor of Richmond on his § 1983 claim, but awarded him a mere $1 in compensatory damages. The jury did, however, award Richmond $65,000 in punitive damages. It is unclear whether attorney fees were awarded. Moreover, the relinquishment agreements were declared null and void by the court in its June 3, 2003, judgment.
Case appealed to this court. While that appeal was pending, the parties agreed to a settlement. Case agreed to abandon the appeal if Richmond accepted a $130,000 settlement, of which $84,031.65 was for attorney fees and another $4,977.17 for costs. The remaining $40,991.18 represented "compensatory damages" under the terms of the agreement. Richmond accepted the offer, and the appeal was dismissed by joint stipulation.
On May 20, 2004, less than a year later, Richmond filed another complaint against Case in the district court for Kimball County. This time, Richmond filed the complaint against Case in her personal capacity on behalf of his then minor daughter, Amanda. Among other claims, the complaint alleged that Case's misconduct had deprived Amanda of her substantive due process rights to a parent-child relationship in violation of § 1983. All other causes of action were quickly abandoned so that only the § 1983 claim remained. Amanda then moved for summary judgment on the issue of "liability." A hearing was held on November 1, 2005, to resolve the motion.
The district court found that the judgment against Case in the previous suit in Kimball County District Court, case No. CI99-82 (hereinafter CI99-82) had a preclusive effect regarding her misconduct in dealing with Richmond. The court concluded that such misconduct not only violated Richmond's parental rights, but also violated Amanda's substantive due process rights as a child. Finally, the court relied on deposition testimony by Dr. Daniel Scharf, a psychologist who evaluated Amanda, in concluding that the relinquishment had caused harm to Amanda. Accordingly, the court granted Amanda's motion for summary judgment as to Case's liability and scheduled a bench trial on the issue of damages.
On May 24, 2006, the district court issued a judgment awarding Amanda $150,000 in damages. In its judgment, the court recounted the aforementioned sequence of events. The court also noted that sometime after the relinquishment, Amanda began to use drugs, ran away from (and refuses to return to) the home of Clyde and Connie, gave birth to a child out of wedlock, and appears to be suffering financially. In short, the court found that Case "interfered with [Amanda's] parent-child relationship with [Richmond]." and that Amanda's life "spun out of control" as a result.
After the court issued its judgment, Amanda filed a petition on June 13, 2006, requesting legal fees, expenses, and costs. Per a stipulated order, the court awarded Amanda $53,437.50 in attorney fees and another $11,260.03 in costs and expenses. Case now appeals.

III. ASSIGNMENTS OF ERROR
Case assigns, restated, that the district court erred when it (1) relied on the doctrine of collateral estoppel to find that Case violated Amanda's substantive due process rights, (2) mishandled the inquiry into whether Case's actions caused actual harm to Amanda, and (3) failed to recognize the existence of genuine issues of fact.

IV. STANDARD OF REVIEW
[1] Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts, or as to the ultimate inferences that may be drawn from those facts, and that the moving party is entitled to judgment as a matter of law.[2]
[2,3] A party makes a prima facie case that it is entitled to summary judgment by offering sufficient evidence that, assuming it went uncontested at trial, would entitle the party to a favorable verdict.[3] If the moving party makes such a case, the burden then shifts to the nonmoving party to avoid summary judgment by producing admissible contradictory evidence which raises a genuine issue of material fact.[4]
[4,5] In reviewing summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, giving that party the benefit of all reasonable inferences deducible from the evidences[5] On questions of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.[6]

V. ANALYSIS

1. COLLATERAL ESTOPPEL
In her first assignment of error, Case contends that the district court erroneously concluded that the judgment in CI99-82 had a preclusive effect regarding whether Case violated Amanda's constitutional rights in this case. To refresh, in CI99-82, a jury found that Case violated Richmond's substantive due process right to custody of Amanda. The district court found that Case's "interference with the parent-child relationship between Gary Richmond and Amanda C[.]" was an issue "fully determined" in CI99-82. This conclusion was based on the court's belief that "[t]he facts are the same and the same relationship was affected [in this case]." As a result, the court determined that the judgment in CI99-82 rendered it unnecessary to relitigate whether Case violated Amanda's constitutional rights.
[6,7] Under the doctrine of collateral estoppel, also known as issue preclusion, an issue of ultimate fact that was determined by a valid and final judgment cannot be litigated again between the same parties or their privities in any future lawsuit.[7] Collateral estoppel is applicable where (1) an identical issue was decided in a prior action, (2) the prior action resulted in a judgment on the merits which was final, (3) the party against whom the doctrine is to be applied was a party or was in privity with a party to the prior action, and (4) there was an opportunity to fully and fairly litigate the issue in the prior action.[8]
There is no dispute that CI99-82 resulted in a final judgment on the merits. Nor is there a dispute that Casethe party against whom issue preclusion is soughtwas a party in CI99-82. The only real question is whether Case's interference with Richmond's substantive due process rights regarding Amanda is identical to the underlying issue of whether Case interfered with Amanda's substantive due process rights, if any, regarding Richmond. If so, then Case had the opportunity to fully and fairly litigate that issue in CI99-82 and Amanda would therefore be entitled to collateral estoppel.
[8,9] Amanda alleged that Case interfered with her substantive due process rights regarding the parent-child relationship between her and Richmond. Accordingly, Amanda sought relief under § 1983, which provides a civil remedy for "deprivations of federally protected rights," statutory or constitutional, "caused by persons acting under color of state law."[9]
[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.[10]
Case concedes that she was acting under color of state law at all times relevant to this controversy. The only remaining question, then, is whether Case's interference with Richmond's constitutional rights also deprived Amanda of her constitutional rights.
[10] It is beyond dispute that under the U.S. Supreme Court's longstanding precedent, a parent has a constitutional right to retain custody and control of his or her child.[11] A fundamental question here is whether the corollary is truethat is, whether a child has a constitutional right to be under the care, custody, and control of his or her parent.
[11,12] In In re Guardianship of D.J., we observed that both "`parents and their children have a recognized unique and legal interest in, and a constitutionally protected right to, companionship.'"[12] In other words, the substantive due process right to family integrity "`protects not only the parent's right to the companionship, care, custody, and management of his or her child, but also protects the child's reciprocal right to be raised and nurtured by [his or her] biological ... parent."[13] It is clear, therefore, that both parents and their children have cognizable substantive due process rights to the parent-child relationship.
Nevertheless, Case presents two arguments as to why her interaction with Richmond, however wrongful, did not actually violate Amanda's substantive due process rights to be raised and nurtured by Richmond. First, Case suggests that even if she violated Richmond's constitutional rights by persuading him to relinquish his right to custody, she did not violate Amanda's constitutional rights because the relinquishment was ultimately in Amanda's best interests. Case does not, however, support her conclusion with any proof that the relinquishment was in Amanda's best interests. In fact, the evidence presented at the summary judgment stage suggests quite the oppositethat the relinquishment led to a downward spiral in Amanda's development.
[13] The irony is that due to Case's intervention, the county court for Kimball County was never able to accurately determine if, in fact, a termination of Richmond's parental rights was in Amanda's best interests. This is significant because, as the U.S. Supreme Court observed in Quillion v. Walcott,[14] "the Due Process Clause would be offended a State were to attempt to force the breakup of a natural family ... without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." Under Quillion, Case's belief that she was acting in Amanda's best interests does not diminish the fact that Case violated Amanda's constitutional rights by subverting established procedure in an attempt to divest Richmond of his parental rights.
[14] Case next argues that her conduct did not actually implicate either Richmond's or Amanda's substantive due process rights because the parent-child relationship had deteriorated by the time she intervened. As Case correctly points out, substantive due process rights between a parent and child do not arise simply by virtue of a genetic connection. Rather, they depend on a deeper, more enduring relationship.
[15] For example, in Lehr v. Robertson,[15] the U.S. Supreme Court held that a father who
accepts some measure of responsibility for the child's future ... may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. [But if] he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.
We can infer from this language that blood alone may not suffice to permit a parent to assert the due process right to custody and control of his or her child if the parent has altogether failed to shoulder the responsibilities inherent in the parenthood. Relying on such sentiments, Case reminds us that Richmond had largely failed to maintain the father-daughter relationship in the years prior to Case's intervention.
But even if Richmond did neglect Amanda, such neglect is irrelevant because this case involves Amanda's constitutional rights, not Richmond's. It is doubtful that Lehr's emphasis on responsibility works exactly the same in reversethat is, that a minor child could not assert his or her due process right to parental control where the child "allowed" his or her parental relationship to lapse. But even if it does, Case has not shown that Amanda, a young child at the time, voluntarily failed to embrace her relationship with Richmond. The evidence shows that at a very young age, Amanda was taken from her home, placed in DHHS custody, and thereafter relocated as DHHS saw fit. Although the bond between Amanda and Richmond had withered before Case even intervened, it was not due to Amanda's failure to nurture it. So while Richmond's alleged failure to embrace his relationship with Amanda might have affected his ability to invoke his parental rights and thus recover under § 1983, it will not prevent Amanda from doing so.
[16] Having rejected those two arguments, we pause to note another avenue Case could have pursuedbut inexplicably avoidedin an attempt to evade liability. We refer, of course, to the defense of qualified immunity. Public officials like Case who have been sued in their personal capacities under § 1983 may invoke qualified immunity as "a shield from liability" if the "official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[16] This defense is commonly raised by, and has been granted to, social service workers.[17]
[17] Case referred to the qualified immunity defense in her responsive pleading before the district court. It is clear that the district court did not grant Case qualified immunity. But the record does not show whether this was because the court concluded that Case was not entitled to such immunity or because Case abandoned the claim herself. Either way, Case did not mention the defense in her brief before this court. We will not review errors that were not assigned and argued in a party's brief.[18] Accordingly, we will not consider whether Case is entitled to qualified immunity. Instead, we mention the qualified immunity defense only to dispel any notion that state employees will automatically be held personally liable for substantial monetary damages any time they infringe upon a citizen's constitutional rights.
We conclude that proof that Case wrongfully interfered with Richmond's custody and control over Amanda would also establish that Case wrongfully interfered with Amanda's constitutional right to be in Richmond's custody. Whether Case wrongfully interfered with Richmond's right to custody and control of Amanda was the issue at the heart of CI99-82. Case suffered an adverse judgment on that issue after full and fair litigation. Accordingly, the district court did not err in concluding that the judgment in CI99-82 precludes Case from contesting whether she interfered with Amanda's constitutional rights by wrongfully counseling Richmond to relinquish custody of Amanda.

2. CAUSATION
In her next assignment of error, Case contends that the district court mishandled the inquiry into whether Case's conduct was the cause of Amanda's harm. Case's argument in this regard proceeds in two parts. First, Case argues that Amanda failed to present sufficient evidence that Case's misconduct resulted in actual harm to Amanda. Second, Case argues that the district court's causation analysis was inherently flawed because it considered evidence of Amanda's "damages" instead of confining its analysis solely to issues of "liability."

(a) Actual Harm
[18] To recover compensatory damages in a § 1983 action, the claimant must show that the violation of his or her rights resulted in some actual harm.[19] This requires both proof of some actual harm to the claimant and a causal relationship between that harm and the violation of the claimant's federal rights.
Case does not seem to dispute that Amanda actually suffers from numerous social problems. Rather, Case seems to argue that those problems did not result from any misconduct by Case, but stem from a number of other threats to Amanda's ordinary social development. As Case points out, Amanda was abused by her mother, Carol; removed from her biological home at an early age; relocated from Kimball to Omaha to live with Clyde and Connie; and was unable to see Richmond on a regular basis, if at all. All of these things, Case argues, affected Amanda's development and cannot be attributed to Case. At bottom, this argument refers to causation.
[19-21] Causation issues in § 1983 actions are generally resolved according to common-law tort principles.[20] As a general matter, a proximate cause is defined as "that cause which, in a natural and continuous sequence, without any efficient, intervening cause, produces the injury, and without which the injury would not have occurred."[21] So, ordinarily,
a plaintiff must meet three basic requirements in establishing proximate cause: (1) that without the [misconduct], the injury would not have occurred, commonly known as the "but for" rule; (2) that the injury was a natural and probable result of the [misconduct]; and (3) that there was no efficient intervening cause.[22]
[22] We have also held, however, that an act need not be the sole cause of harm to qualify as a proximate cause. When multiple causes act to produce a single injury, any one of those acts can still qualify as a proximate cause of that harm so long as it was a substantial factor in bringing about the injury.[23]
In support of her motion for summary judgment, Amanda presented deposition testimony and an accompanying affidavit from Scharf, a psychologist licensed in the State of Nebraska. Scharf evaluated Amanda and reviewed her file. Scharf's testimony supports the conclusion that the relinquishment was a substantial factor in bringing about Amanda's subsequent social problems.
Scharf acknowledged that Amanda faced a number of "risk factors" in addition to Richmond's relinquishment of custody and thus, that the "relinquishment [was] one of a couple of risk factors" affecting Amanda's development. However, Scharf also noted that Amanda seemed to handle most of the other developmental risk factors without many adverse effects. Scharf found that "until about age 12 or 13," the approximate time of the relinquishment, Amanda had "adjusted fairly well... and done real well in school and done well with friends." But soon after the relinquishment, Amanda faced a "decrease in scholastic achievement, ... substance abuse, [and] difficulties with depression." Ultimately, this led Scharf to conclude that "the relinquishment did have an effect on Amanda."
Scharf's testimony not only supports a finding that Amanda suffered actual harm, but also that the relinquishment was a substantial factor in causing that harm. Scharf's testimony suggests that the relinquishment was at least as significant an agent as the other obstacles Amanda faced in bringing about her downward social spiral. Amanda's presentation of such evidence therefore shifted the burden to Case to present contradictory evidence that Amanda did not suffer actual harm or at least evidence that the formal relinquishment was not a substantial factor in bringing about such harm. Case did not present any such evidence. The court did not err, therefore, in concluding that summary judgment was proper on the issue of proximate causation.

(b) Consideration of "Damages" Evidence at Causation Stage
At one point in her brief, Case argues that the district court's causation analysis was flawed because the court "failed to distinguish [(1)] the causal connection between [Case's] conduct and the alleged violation of [Amanda's] civil rights from [(2)] the causal connection between the violation of [Amanda's] civil rights and the alleged injury to [Amandal."[24] Case believes that the first inquirywhether Case's conduct violated Amanda's civil rightsis a question of liability and was therefore properly considered by the court at the summary judgment stage. But Case believes that the second questionwhether the alleged violation of Amanda's civil rights caused any actual harmis more a question of damages. Thus, Case believes that the district court erroneously merged these two issues when, in the course of ruling on Case's "liability," it considered Scharf's testimony regarding actual harm to Amanda.
There is no limit, however, to the issues that a party can focus on in his or her own motion for summary judgment. Amanda moved for summary judgment on the "issue of liability" and was free to define the scope of that motion. To Amanda, "liability" appears to have meant not only that Case's conduct violated her constitutional rights, but also that the violation of those rights caused actual harm to her. On the former issue, Amanda offered evidence of the prior judgment in C199-82 and argued that the judgment had preclusive effect. Regarding the latter issue, Amanda offered Scharf's deposition testimony and a sworn affidavit.
By arguing that the district court improperly considered Scharf's testimony at the summary judgment stage, Case attempts to supplant her own characterization of what Amanda actually sought with her motion for summary judgment. That is, Case attempts to characterize Amanda's motion as a motion for summary judgment only on the issue of whether Case violated Amanda's constitutional rights.
But if Amanda sought summary judgment on that issue alone, there was no reason to submit Scharf's testimony and affidavit in support of her motion. As was shown above, that evidence does nothing more than establish the existence of actual harm and provide a causal link between that harm and the violation of Amanda's rights. As such, the inclusion of that evidence should have sent a clear sign to Case that if the court granted Amanda's motion in full, the only issue left to resolve regarding "damages" would be the extent, not the existence, of those damages. Case had the opportunity, therefore, to present evidence that would negate the existence of Amanda's damages. For whatever reason, Case did not make the most of that opportunity. But Case's omission does not mean the district court erred in its causation analysis.

3. GENUINE ISSUES OF FACT
In her final assignment of error, Case contends that the district court erred by failing to recognize the existence of genuine factual disputes regarding Case's conduct and proximate causation.

(a) Genuine Issues Regarding Case's Conduct
As Case notes, the parties disagree on a number of details surrounding Case and Richmond's interactions before Richmond agreed to relinquish custody of Amanda. Case believes that these factual disputes raise legitimate issues of fact as to whether she truly violated Amanda's constitutional rights.
These factual disputes, however, are made irrelevant by the preclusive effect that the prior judgment in CI99-82 is entitled to in this case. Factual disputes between the parties regarding Richmond and Case's encounters leading up to the relinquishment did not deter a jury from finding that Case violated Richmond's rights. If Case has no right to challenge that determination, it obviously follows that she has no right to question the facts upon which that determination depends.

(b) Genuine Issues Regarding Causation
Case also argues that genuine issues of fact exist regarding whether Case's misconduct caused Amanda any harm. In support of this proposition, Case renews the argument that Amanda and Richmond were essentially estranged before she even intervened. Indeed, Case maintains that "it was by no means a for[e]gone conclusion that [Richmond] would be reunited with [Amanda] but for the signing of the relinquishment papers."[25] This may be true, but the argument misses the point.
[23] The question at this stage is whether there are genuine issues of material fact.[26] In the summary judgment context, a fact is material only if it would affect the outcome of the case.[27] Proof that Amanda and Richmond would not have reunited even without Case's intervention is not material because, according to Scharf's testimony, the formal relinquishment caused harm to Amanda in and of itself As Scharf testified, the relinquishment harmed Amanda because it contributed to a downward spiral in her social life, not because it reduced the odds that Amanda and Richmond would unite.
The only real evidence that might raise a genuine issue of material fact in light of Scharf's testimony would be contrary testimony by another psychological expert. But Case did not present such evidence. Accordingly, it cannot be said that genuine issues of material fact remain regarding the causal relationship between Case's violation of Amanda's rights and the resulting harm to Amanda.

VI. CONCLUSION
The district court did not err in concluding that the judgment in CI99-82, the prior controversy involving Richmond and Case, precluded Case from relitigating the wrongfulness of her decision to counsel Richmond to relinquish custody of Amanda. A violation of Richmond's constitutional rights as a parent would also result in a violation of Amanda's reciprocal constitutional rights as a child. Therefore, under the doctrine of collateral estoppel, the judgment in CI99-82 precluded Case from disputing the fact that she violated Amanda's constitutional rights.
The district court also did not err in concluding that Case's violation of Amanda's rights resulted in actual harm to Amanda. The evidence shows that the relinquishment that Case wrongfully orchestrated was a substantial factor in Amanda's downward social spiral. Nor did the court err in considering such evidence at the summary judgment stage.
Finally, there are no genuine issues of material fact regarding Case's liability to Amanda. Any factual disputes regarding Case's actual conduct are made irrelevant by the preclusive effect of the judgment in CI99-82. Similarly, the fact that Amanda might not have reunited with Richmond even if Case never intervened is irrelevant. The evidence shows that the relinquishment in and of itself caused harm to Amanda. From the above, we conclude that the district court did not err in granting summary judgment to Amanda.
AFFIRMED.
NOTES
[1] See Richmond v. Case, Kimball County District Court, case No. CI99-82.
[2] See Didier v. Ash Grove Cement Co., 272 Neb. 28, 718 N.W.2d 484 (2006).
[3] See Marksmeier v. McGregor Corp., 272 Neb. 401, 722 N.W.2d 65 (2006).
[4] See id.
[5] See Didier, supra note 2.
[6] Ichtertz v. Orthopaedic Specialists of Neb., 273 Neb. 466, 730 N.W.2d 798 (2007).
[7] See Stevenson v. Wright, 273 Neb. 789, 733 N.W.2d 559 (2007).
[8] See id.
[9] Parratt v. Taylor, 451 U.S. 527, 535, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), overruled on other grounds, Daniels v. Williams, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986).
[10] Id.
[11] See Troxel v. Granville, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion) (citing Prince v. Massachusetts, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944); Pierce v. Society of Sisters, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923)).
[12] In re Guardianship of D.J., 268 Neb. 239, 246, 682 N.W.2d 238, 244 (2004) (emphasis supplied).
[13] Id. (emphasis supplied).
[14] Quilloin v. Walcott, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978) (alteration in original) (quoting Smith v. Organization of Foster Families, 431 U.S. 816, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977) (Stewart, J., concurring in judgment)).
[15] Lehr v. Robertson, 463 U.S. 248, 262, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983).
[16] Williams v. Baird, 273 Neb. 977, 985, 735 N.W.2d 383, 391 (2007).
[17] See id. n.32 (collecting cases).
[18] See, Fickle v. State, 273 Neb. 990, 735 N.W.2d 754 (2007), modified on other grounds 274 Neb. 267, 735 N.W.2d 754; Epp v. Lauby, 271 Neb. 640, 715 N.W.2d 501 (2006).
[19] See Carey v. Piphus, 435 U.S. 247, 266, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978).
[20] See, e.g., Martinez v. California, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481 (1980) (citing Grimm v. Arizona Bd. of Pardons & Paroles, 115 Ariz. 260, 564 P.2d 1227 (1977), and Palsgraf v. Long Island R. R. Co., 248 N.Y. 339, 162 N.E. 99 (1928)); Ricketts v. City of Columbia, Missouri, 36 F.3d 775 (8th Cir. 1994).
[21] Haselhorst v. State, 240 Neb. 891, 899, 485 N.W.2d 180, 187 (1992).
[22] Stahlecker v. Ford Motor Co., 266 Neb. 601, 609-10, 667 N.W.2d 244, 254 (2003).
[23] Reimer v. Surgical Servs. of the Great Plains, 258 Neb. 671, 605 N.W.2d 777 (2000).
[24] Reply brief for appellant at 7.
[25] Id. at 11.
[26] See Didier, supra note 2.
[27] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).