771 N.W.2d 908 (2009)
278 Neb. 532
Patricia C. TOLLIVER and Betsye S. Manser, individually and as Copersonal Representatives of the Estate of Frances L. Tolliver, Deceased, Appellants,
v.
VISITING NURSE ASSOCIATION OF the MIDLANDS, a Nebraska Corporation, et al., Appellees.
No. S-08-357.
Supreme Court of Nebraska.
September 11, 2009.
*910 David A. Domina and Linda S. Christensen, of Domina Law Group, P.C., L.L.O., Omaha, for appellants.
David L. Welch and Lisa M. Meyer, of Pansing, Hogan, Ernst & Bachman, L.L.P., Omaha, for appellees.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.
CONNOLLY, J.

SUMMARY
The appellants, Patricia C. Tolliver and Betsye S. Manser, are the daughters of *911 Frances L. Tolliver and the copersonal representatives of Frances' estate (collectively the estate). Frances died while residing at Hospice House. The estate sought damages for Frances' pain and suffering while residing there. It sued Hospice House; the Visiting Nurse Association (VNA), which provided hospice care in a joint venture with Hospice House; and Tiki Mumm, a registered nurse who worked for the VNA. The estate alleged that Hospice House was negligent in caring for Frances and that it misrepresented the type of care she would receive. The district court directed a verdict against the estate's misrepresentation claims because it concluded that in a fraud action, the damages are limited to pecuniary losses. On the negligence claim, the jury awarded the estate $12,500 in damages.
The estate asks this court to adopt the Restatement (Second) of Torts § 557A.[1] It contends that adopting § 557A would allow a party who is physically harmed by a defendant's misrepresentation to recover noneconomic damages. In addition, the estate claims that the trial court erred in excluding the testimony of one of its medical experts. We decline to adopt § 557A because the damages the estate seeks were available under its negligence theory. We further conclude that the excluded expert testimony was cumulative to other experts' testimony. We affirm.

BACKGROUND
In 2004, at the age of 85. Frances was terminally ill with cancer. Her physician ordered hospice care for Frances. She chose to have the VNA provide hospice care for her at Hospice House.
In 2004, Hospice House was licensed to provide assisted living services, not inpatient hospice services. There is a difference. An assisted living facility provides supportive services for a person's comfort, personal care, and daily living and health maintenance activities.[2] In contrast, hospice service is defined as "a person or any legal entity which provides home care, palliative care, or other supportive services to terminally ill persons and their families."[3]
Hospice House represented in its brochure that it provided licensed practical nurses, certified nursing assistants, and volunteers "in conjunction with a Hospice Team." Hospice House required its residents to select from the VNA, "Methodist," or "Alegent" as their hospice agency or team. Hospice House's service agreement required residents to agree that they were choosing palliative, not curative, care. Residents also agreed that after they consulted with their physician, the chosen hospice agency would provide their professional medical and nursing services; these services included a registered nurse as a case manager. Each resident agreed to be transferred to an appropriate place if the resident's needs exceeded services provided by Hospice House staff or the resident's chosen agency. Neither the Hospice House brochure nor the service agreement explicitly stated whether registered nurses were present daily to assess or care for patients at Hospice House. The daughters testified that Frances and they believed the care at Hospice House would include registered nurses because of these documents and the Hospice House director's statements.
The VNA provided hospice care for Frances in her home until a room became *912 available at Hospice House. She was a patient at Hospice House for 23 days, from June 9 until July 1, 2004, the day she died.

THE COMPLAINT
In September 2006, the estate filed its operative complaint. It generally alleged that Hospice House had misrepresented that trained professionals would be providing hospice care. It also alleged that Frances and her daughters had reasonably relied on these misrepresentations.
The estate first claimed negligence against all defendants. Specifically, it made the following allegations: (1) In October 2004, the Nebraska Department of Health and Human Services had responded to its complaint and determined that the Hospice House staff had failed to follow Frances' physician's plan of care for Frances; (2) Frances had suffered excruciating pain from June 27 until her death on July 1 because the defendants had wrongfully withheld pain medications; (3) the final 22 days of Frances' life "were filled with unnecessary and avoidable distress, discomfort and pain because of the inappropriate and insufficient care she received"; (4) Mumm's negligence was imputed to the VNA and Hospice House under the doctrine of respondeat superior; and (5) the VNA and Hospice House were independently negligent in failing to appropriately train and supervise their personnel.
The estate also labeled its second claim "negligence," but we interpret the allegations as stating a claim for negligent misrepresentation. For this claim, the estate made these allegations: (1) The VNA and Hospice House had breached a duty to truthfully disclose that Hospice House was credentialed as an assisted living facility, and Hospice House had misrepresented that the defendants provided skilled hospice care for dying persons; (2) the defendants had breached a duty to disclose that Hospice House did not train its staff in the acute care of dying persons; (3) the defendants had misled the public by holding Hospice House out as a hospice care facility; and (4) Frances and her daughters had relied on its misrepresentations to their detriment. The estate's third claim alleged the same facts but claimed that the misrepresentation was intentional.

TRIAL
At trial, much of the estate's evidence focused on the conduct of Mumm. On July 27, 2004, without observing Frances, Mumm instructed the Hospice House staff to withhold one of Frances' pain medications and to reduce another. Two medical experts testified that Mumm's conduct in changing Frances' physician's orders for medications fell below the standard of caring for dying patients who have chosen palliative care. They also testified that Mumm's conduct had caused Frances to experience increased and severe pain. One of these experts was Frances' niece, Mary Kay Gamble. Gamble is a registered nurse and nurse practitioner, with a master's degree in geriatric nursing and expertise in hospice care. She had stayed with the family for several nights before Frances' death. She testified that she observed the following additional nursing deficiencies in Frances' care: (1) poor pain assessments; (2) poor administration of liquid narcotics, so that Frances drooled out most of her medication; and (3) poor repositioning of Frances.
The court excluded part of the testimony from a third expert, James Dube, Ph.D. Dube has a doctorate in pharmacy. He testified that the nurses had failed to consult with Frances' physician regarding *913 changes to her condition and medications. The court also allowed him to testify that the nurses did not give Frances adequate amounts of medication. But the court excluded his opinion that Frances had suffered increased pain because the nurses had not given the prescribed amount of pain medication.
After the estate rested, the defendants moved for a directed verdict and a dismissal of all claims. In addition to arguing that the evidence was insufficient to submit the claims to the jury, the defendants argued that the law limited damages for both negligent and fraudulent misrepresentation to pecuniary loss. They contended that the estate had failed to show pecuniary damages. The estate responded that because of the misrepresentations, Frances had suffered damages that included conscious pain and suffering. But the court disagreed and concluded that case law limited damages for misrepresentation to pecuniary loss and that a plaintiff could not recover damages for pain and suffering. It dismissed the negligent and fraudulent misrepresentation claims but overruled the motion regarding the negligence claim.

JURY INSTRUCTIONS
At the jury instruction conference, the court determined as a matter of law that Hospice House and the VNA were joint venturers. The estate did not object to the jury instructions, but it preserved its argument regarding the court's order dismissing its misrepresentation claims.
The instructions included an uncontroverted facts section. This section informed the jury that Frances' physician had developed a plan of care for Frances that included pain management through prescription drugs. It further stated that the VNA and Hospice House were to use this plan for Frances' hospice and palliative care. Finally, this section stated that on June 27, 2004, Mumm had instructed the Hospice House staff to withhold a narcotic skin patch from Frances and instead administer a liquid narcotic medication.
Regarding the estate's claims, instruction No. 2 stated that the estate claimed Mumm was professionally negligent and had caused Frances pain and suffering through the following conduct: (1) failing to follow Frances' plan of care and instructing the Hospice House staff to withhold a narcotic skin patch, without obtaining a physician's order and without observing Frances; (2) failing to understand the absorption properties of the skin patch; (3) failing to discuss changes in Frances' pain medications with her family; and (4) using only the liquid narcotic medication to treat Frances and failing to use the maximum dose permitted. Regarding the VNA's liability, the instruction stated that the estate claimed Mumm's negligence was imputed to the VNA as Mumm's employer. Regarding Hospice House's liability, the instruction stated that the estate claimed Mumm's negligence was imputed to Hospice House as a joint venturer with the VNA.
In short, the instructions tied each defendant's negligence liability to Mumm's conduct on or after June 27, 2004, instead of Hospice House's conduct during the entire time Frances resided at Hospice House. Instruction No. 9 specifically stated that if the jury found that Mumm was liable, then the VNA and Hospice House were also liable.
Regarding damages, instruction No. 11 informed the jurors that if they returned a verdict for the plaintiffs, they should consider only those things proximately caused *914 by the defendants' negligence. The only item listed for consideration was "[t]he reasonable value of the physical pain and mental suffering experienced by Frances..., the Deceased, during her time at Hospice House."

ASSIGNMENTS OF ERROR
The estate assigns three errors:
(1) The district court erred in sustaining the defendants' motion to dismiss the estate's intentional misrepresentation and concealment claims.
(2) The district court erred in sustaining the defendants' motion to dismiss the estate's negligent misrepresentation and concealment claims.
(3) The district court erred in excluding the estate's expert's testimony.

STANDARD OF REVIEW
While the amount of damages presents a question of fact, the proper measure of damages presents a question of law.[4] We resolve questions of law independently of the determination reached by the court below.[5] And we review for abuse of discretion a trial court's decision whether to admit or exclude an expert's testimony under the appropriate standards.[6]

ANALYSIS

FRAUDULENT AND NEGLIGENT MISREPRESENTATION CLAIMS
The estate contends that the court erred when it dismissed the estate's claims for intentional misrepresentation and intentional concealment and its claims for negligent misrepresentation and negligent concealment.
In its brief, the estate synonymously uses the terms "misrepresentation" and "concealment." It has not cited any authority recognizing a claim of "negligent concealment" in a commercial context.[7] It is true that we have recognized a claim for fraudulent concealment in a business transaction.[8] But the estate did not allege separate claims of misrepresentation and concealment, nor did the court interpret the estate's complaint as alleging separate claims. And so we will consider only whether the court's order dismissing the estate's claims for fraudulent and negligent misrepresentation was reversible error.
Although fraud is often a component of other torts, including torts involving negligent conduct, the distinct tort of fraud or misrepresentation is generally an economic tort against financial interests, *915 asserted to recover pecuniary loss.[9] One who makes a fraudulent or negligent misrepresentation in a business transaction is normally liable only for the recipient's pecuniary losses.[10] And a pecuniary loss is a "loss of money or of something having monetary value."[11] For misrepresentation claims, a defendant's liability for pecuniary losses is generally limited to the plaintiff's out-of-pocket losses or sometimes benefit-of-the-bargain losses, depending upon the context and type of misrepresentation.[12] But the estate argues that permitting plaintiffs to recover only pecuniary losses for a misrepresentation claim is contrary to § 557A of the Restatement which provides: "One who by a fraudulent misrepresentation or nondisclosure of a fact that it is his duty to disclose causes physical harm to the person or to the land or chattel of another who justifiably relies upon the misrepresentation, is subject to liability to the other."[13]
Section 557A clearly imposes liability for physical harm caused by a person's fraudulent misrepresentation or non-disclosure. But it leaves open important questions: For what loss is the defendant liable? Is liability limited to pecuniary losses? We conclude that when read consistently with its comments and other Restatement sections, § 557A provides scant support for permitting noneconomic damages.
Section 557A first appeared in the 1965 tentative draft of the Restatement.[14] In a note to that tentative draft, the American Law Institute authors stated that this section was added to permit parties to maintain an action for deceit when a misrepresentation results in physical harm. But the authors have also stated that § 557A is subject to the rules for fraudulent misrepresentations stated in §§ 525 to 551, except for § 548A.[15] Section 548A is not applicable to our analysis. Section 549, however, does apply to claims under § 557A. Section 549 sets out the measure of damages for fraudulent misrepresentations. It limits a plaintiff's recovery to pecuniary losses. And pain and suffering are not a component of pecuniary loss.
It does appear that the American Law Institute authors intended to impose greater liability on defendants when their fraudulent misrepresentations result in physical harm. The Restatement's § 525 states the liability rule for fraudulent misrepresentations. But comment h. states that this is not the liability rule when a misrepresentation causes physical harm and refers the reader to § 557A. In distinguishing between the pecuniary losses permitted under § 525 and the general economic losses permitted under § 557A, comment h. provides in part:

*916 This Section (and this Chapter) covers pecuniary loss resulting from a fraudulent misrepresentation, and not physical harm resulting from the misrepresentation. As to the latter, see § 557A, which also covers the economic loss deriving from the physical harm. This type of economic loss is not intended to be included in the term, pecuniary loss, as used in this Chapter.[16]
Comment a. to § 557A similarly provides that when physical harm occurs to a person, land, or chattel because of a person's justifiable reliance on a fraudulent misrepresentation, the defendant's "liability also extends to the economic loss resulting from the physical harm."[17] By including liability for economic loss, the authors apparently meant that a defendant would be liable for the pecuniary loss normally allowed for misrepresentations and for other, additional economic losses.
Economic losses can include more than out-of-pocket and benefit-of-the-bargain losses. They include monetary losses for medical expenses, loss of earnings and earning capacity, funeral costs, loss of use of property, costs of repair or replacement, costs of domestic services, loss of employment, and loss of business or employment opportunities.[18] But economic losses are still monetary losses. And nothing in § 557A or its comments extends a defendant's liability for a fraudulent misrepresentation to noneconomic losses. In contrast to economic losses, noneconomic losses are nonmonetary losses, which include pain, suffering, and other losses that cannot be easily expressed in dollars and cents.[19] In sum, pain and suffering are neither a pecuniary loss nor an economic loss. And remember, the estate's claims are for Frances' pain and suffering.
We recognize that some courts have permitted plaintiffs to recover noneconomic damages under a theory of intentional fraud.[20] But we do not believe permitting pain and suffering damages for a misrepresentation theory is appropriate in this case for two reasons.
First, "other theories of action have been sufficient to deal with non-pecuniary damage," and resort to theory of deceit is usually unnecessary.[21] For example, here, all of the damages the estate seeks under its misrepresentation claims were alleged under its negligence claim. Second, a party may not have double recovery for a single injury or be made more than whole by compensation which exceeds the actual damages sustained.[22] The estate did not specifically allege pain and suffering damages for its misrepresentation claims. If it had, those damages would have duplicated the pain and suffering damages it claimed under its negligence cause of action.
*917 But the estate complains that the court's instruction limited damages for Frances' pain and suffering to that which occurred in the last 5 days of her life. It is true that the court's jury instructions on the estate's negligence claim limited the defendants' negligence liability to Mumm's conduct from June 27 until July 1, 2004, the day Frances died. In the negligence instruction, the court did not specifically instruct the jury that the estate claimed Hospice House's conduct had caused Frances pain and suffering for the entire time that she was a resident. But instruction No. 11 informed the jury that it could consider Frances' physical pain and mental suffering "during her time at Hospice House." Thus, the jury arguably considered Frances' pain and suffering for the entire time that she stayed at Hospice House. To the extent that the negligence instruction failed to specifically state that the estate claimed Hospice House had been negligent even before these final 5 days, the estate failed to object and seek a clearer instruction. It now seeks to piggyback Frances' pain and suffering damages for her entire stay onto its misrepresentation claims. But, as noted, the estate alleged these damages as part of its negligence claim.
In its negligence claim, the estate alleged Frances had suffered pain during the final 22 days of her life because of "the inappropriate and insufficient care she received." It further alleged that Hospice House had breached a duty to have trained staff for the care of terminally ill persons. Yet the court submitted its jury instructions to the parties for review and gave them an opportunity to object. And despite alleging that Hospice House's negligence had caused Frances pain and suffering during her entire stay, the estate did not object that it claimed liability for pain and suffering before the period from June 27 to July 1, 2004.
Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error.[23] An issue not presented to or passed on by the trial court is not appropriate for consideration on appeal.[24] Here, the estate's failure to object and request a clearer instruction on its negligence claim does not present a compelling reason for this court to recognize pain and suffering under a misrepresentation theory. While different facts could present a compelling reason to permit noneconomic damages, they are not present here. We decline to recognize noneconomic damages for a misrepresentation claim.

EXCLUSION OF DUBE'S CAUSATION OPINION REGARDING FRANCES' PAIN WAS NOT REVERSIBLE ERROR
Dube was a pharmacist with clinical experience. The record shows that he had been a consultant to the University of Nebraska Medical Center's hospice team and director of pharmacy at the medical center. The court permitted Dube to testify that the nurses did not give Frances adequate amounts of medication. He also testified that they failed to consult Frances' physician about her condition before they changed his medication orders in the last 5 days of her life. But the court sustained the defendants' objections to Dube's opinion that the nurses' failure to administer adequate medication to Frances *918 had caused her to suffer increased pain. The defendants had objected that Dube lacked expertise and factual knowledge.
The estate argues Dube was qualified to give his opinion that Hospice House's withholding of medication had caused Frances to suffer increased pain. The defendants concede that Dube had expertise in determining "which medications are effective for specific medical conditions."[25] But they contend that the estate failed to establish foundation for Dube's opinion that withholding medication had caused Frances increased pain and suffering. They first argue that the foundation for Dube's opinion was insufficient because Dube had not personally observed Frances. In support of their argument, the defendants rely on two of Dube's statements during direct examination: (1) No one could predict the effect of pain medications on a patient and (2) their effectiveness must be assessed by observing the patient.
Yet, the defendants concede that the court allowed another expert for the estate, June Eilers, Ph.D., to give her opinion without having observed Frances. She opined that withholding the medications had contributed to Frances' increased pain. But the defendants argue that Eilers had a Ph.D. in nursing, expertise in hospice care and pain management, and experience at hospice patients' bedsides. And so it argues that in contrast to Eilers, Dube did not have the experience and expertise to give his causation opinion. We disagree.
The defendants' argument lacks consistency. They concede that Eilers, a qualified expert, without having personally observed Frances, could give a causation opinion regarding Frances' increased pain. But they contend that in Dube's case, he could not do so because he had not personally observed Frances' response to the medications. Dube's testimony that patients must be observed to know whether pain medications are effectively working did not preclude him from giving his opinion. Ample evidence in the record shows that nurses who did observe Frances reported that she was experiencing increased pain in the period after the staff had withheld her pain medications. Dube could rely on these records. And so the issue is whether Dube was qualified to give his opinion that the staff's withholding of pain medications had substantially contributed to the increased pain nurses observed in Frances.
First, we note that although Dube's testimony showed he had training in pharmacology, the estate did not present him as a pharmacology expert; this expertise differs from having expertise in pharmacy. Pharmacology is the study of the origin, nature, chemistry, uses, and effects of drugs.[26] Pharmacy is the study of the preparation, dispensing, and proper use of drugs.[27] But Eilers, whose opinion the court admitted, was also not presented as having expertise in pharmacology. Instead, both experts based their opinions on their extensive clinical experience in observing the effects of pain medications on hospice patients.
Dube admitted that it was highly unusual for a pharmacist to be considered an expert in pain management. But he testified that he had developed his expertise by *919 seeing patients every day while working at the University of Nebraska Medical Center. He further stated that physicians at the medical center had asked for and relied upon his personal observations of patients and recognized him as an authority on pain management. He had written about pain management and had been involved in the development of hospice care programs. He also taught others how to provide effective pain management. We conclude that the court erred in excluding Dube's causation testimony while admitting Eiler's opinion based on a similar foundation.
But Hospice House argues that even if Dube's testimony was admissible, the error was not prejudicial because the testimony was cumulative. On this point, we agree.
To constitute reversible error in a civil case, a trial court's admission or exclusion of evidence must unfairly prejudice a substantial right of the litigant complaining about the ruling.[28] When substantially similar evidence is admitted without objection, an improper exclusion of evidence is ordinarily not prejudicial.[29]
When Dube testified, Eilers and Gamble, two nurses with extensive experience and expertise in hospice care, had already testified. They testified that Mumm's instruction to withhold pain medications had breached the standard of care and caused Frances increased pain and suffering. Eilers held a doctorate in nursing, and Gamble held a master's degree. Gamble had personally observed Frances. As noted, Dube's expertise in pain management was also based on his clinical experience, which overlapped the expertise of Gamble and Eilers. On the issue of causation, his specific expertise in pharmacy did not add a new perspective to the body of evidence. Thus, we conclude that the court's exclusion of Dube's causation opinion did not prejudice the estate.[30]

CONCLUSION
We conclude that the district court did not err in failing to submit the estate's misrepresentation claims to the jury. The estate could not have sought any damages under a theory of misrepresentation additional to those it was entitled to seek under its theory of negligence. We further conclude that the court's exclusion of an expert's causation opinion did not prejudice the estate because it was cumulative to other experts' causation opinions.
AFFIRMED.
MILLER-LERMAN, J., participating on briefs.
NOTES
[1] Restatement (Second) of Torts § 557A (1977).
[2] See Neb.Rev.Stat. § 71-406 (Reissue 2003).
[3] See Neb.Rev.Stat. § 71-418 (Reissue 2003).
[4] See, e.g., Toscano v. Greene Music, 124 Cal. App.4th 685, 21 Cal.Rptr.3d 732 (2004); Jackson v. Morse, 152 N.H. 48, 871 A.2d 47 (2005). Compare, Amanda C. v. Case, 275 Neb. 757, 749 N.W.2d 429 (2008); Braesch v. Union Ins. Co., 237 Neb. 44, 464 N.W.2d 769 (1991), disapproved on other grounds, Wortman v. Unger, 254 Neb. 544, 578 N.W.2d 413 (1998).
[5] Evertson v. City of Kimball, 278 Neb. 1, 767 N.W.2d 751 (2009).
[6] See King v. Burlington Northern Santa Fe Ry. Co., 277 Neb. 203, 762 N.W.2d 24 (2009).
[7] Compare Nelson v. Cheney, 224 Neb. 756, 401 N.W.2d 472 (1987).
[8] See Streeks v. Diamond Hill Farms, Inc., 258 Neb. 581, 605 N.W.2d 110 (2000).
[9] See, United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961); Walsh v. Ingersoll-Rand Co., 656 F.2d 367 (8th Cir. 1981); Doe v. Dilling, 228 Ill.2d 324, 888 N.E.2d 24, 320 Ill.Dec. 807 (2008); 2 Dan B. Dobbs, Law of Remedies § 9.1 (1993); Restatement, supra note 1, ch. 22, scope note.
[10] See, Walsh, supra note 9; Washington Mut. Bank v. Advanced Clearing, Inc., 267 Neb. 951, 679 N.W.2d 207 (2004); Harsche v. Czyz, 157 Neb. 699, 61 N.W.2d 265 (1953); Restatement, supra note 1, §§ 546 and 549.
[11] Black's Law Dictionary 1030 (9th ed. 2009).
[12] See, Streeks, supra note 8; Burke v. Harman, 6 Neb.App. 309, 574 N.W.2d 156 (1998). See, also, Dobbs, supra note 9, § 9.2(2).
[13] Restatement, supra note 1, § 557A at 149.
[14] See Restatement (Second) of Torts (Tentative Draft No. 11, 1965).
[15] See, id.; Restatement, supra note 1, § 557A, comment a.
[16] See Restatement, supra note 1, § 525, comment h. at 58.
[17] See Restatement, supra note 1, § 557A at 149.
[18] See Neb.Rev.Stat. § 25-21, 185.08 (Reissue 2008). See, also, Gourley v. Nebraska Methodist Health Sys., 265 Neb. 918, 663 N.W.2d 43 (2003) (Gerrard, J., concurring).
[19] See, § 25-21, 185.08; Gourley, supra note 18 (Gerrard, J., concurring). Compare, Poppe v. Siefker, 274 Neb. 1, 735 N.W.2d 784 (2007); Nelson v. Dolan, 230 Neb. 848, 434 N.W.2d 25 (1989).
[20] See Annot., 11 A.L.R.5th 88 (1993).
[21] W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 105 at 726 (5th ed. 1984).
[22] Genetti v. Caterpillar, Inc., 261 Neb. 98, 621 N.W.2d 529 (2001).
[23] Houston v. Metrovision, Inc., 267 Neb. 730, 677 N.W.2d 139 (2004).
[24] Id.
[25] Brief for appellees at 30.
[26] See Dorland's Illustrated Medical Dictionary (28th ed. 1994).
[27] See id.
[28] See Leavitt v. Magid, 257 Neb. 440, 598 N.W.2d 722 (1999).
[29] See id.
[30] See id.