# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 27, 2010 Session

# TINA MARIE HODGE v. CHADWICK CRAIG

**An Appeal from the Maury County Chancery Court**
**No. 00-699     Jim T. Hamilton, Chancellor**

---

**No. M2009-00930-COA-R3-CV - Filed October 13, 2010**

---

This is a fraud claim between ex-spouses. While the petitioner mother and the respondent were dating, the mother became pregnant, and she told the respondent that the child was his. Consequently, she and the respondent married, and the child was born during the marriage. Years later, the parties divorced, and the respondent paid child support to the mother. After several years, the respondent obtained a DNA test, which revealed that he is not the child's biological father. After he told the mother of the test results, she filed a petition requesting a court-ordered paternity test and modification of the parenting plan. The respondent filed a counter-petition, alleging negligent and/or intentional misrepresentation by the mother for falsely representing that he was the child's biological father. After a bench trial, the trial court awarded the respondent compensatory damages for past child support, medical expenses, and insurance premiums paid for the child, compensatory damages for emotional distress, and attorney fees. The mother now appeals. We conclude that under Tennessee statutes, the respondent cannot recover the past child support, medical expenses, and insurance premiums, as this would be a retroactive modification of a valid child support order. We find that the remaining damages for emotional distress cannot be awarded for the tort of fraud and misrepresentation, because such damages are non-pecuniary. Therefore, we reverse the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

J. Samuel Patterson, Jr., Columbia, Tennessee, for the appellant, Tina Marie Hodge

J. Russell Parkes, Wesley Mack Bryant & Charles M. Molder, Columbia, Tennessee, for the appellee, Chadwick Craig

## OPINION

### FACTS AND PROCEEDINGS BELOW

Appellant Tina Marie Hodge ("Mother") and Appellee Chadwick Craig ("Husband") began dating "on and off" in high school in 1989. Their relationship included sexual intimacy. At the time, Mother had a two-year-old daughter, A, from a previous relationship. In early October 1991, Mother and Husband discontinued their relationship for two or three weeks. During this time, unbeknownst to Husband, Mother had sexual relations with one Joey Hay ("Hay"). After her encounter with Hay, Mother took an early pregnancy test, which was negative. Mother and Husband resumed dating, and she told Husband that she thought she was pregnant. A test at a physician's office in November 1991 confirmed that she was pregnant. Husband would later assert that he asked Mother if the child was his, and she responded, "Yes." This is disputed by Mother. In any event, it is undisputed that Mother did not tell Husband that she had had sexual relations with Hay during their October breakup. Prompted by Mother's pregnancy, Mother and Husband were married in December 1991.

On June 11, 1992, son K was born. Mother listed Husband as K's father on his birth certificate. Husband later adopted Mother's daughter, A. In 1999, Husband had a vasectomy, because he and Mother decided that they did not want to have more children, and Husband believed that he had fathered a son to carry on his family's surname.

Sometime near the end of 2000, Mother informed Husband that she was having an affair with Nick Hodge, her current husband. On February 9, 2001, Mother and Husband divorced. In the final decree, Mother was designated as the primary residential parent for both A and K. Husband was granted residential parenting time with both children and was ordered to pay Mother $250 per month in child support. In October 2003, Husband's child support obligation was reduced to $180 per month.

In June 2003, Husband married Autumn Craig ("Stepmother"), and moved to Bowman, Georgia, with Stepmother and her daughter from a previous relationship. After remarrying, Husband considered having surgery to reverse his vasectomy, in order to conceive a child with Stepmother. Ultimately, he rejected the idea based on his age, the cost of the surgery, and the remote likelihood of success.

In January 2005, son K told Husband that he wanted to move from Mother's house and live with Husband and Stepmother. Consequently, to enable K to live with him but remain near Mother, Husband, Stepmother, and her daughter moved to Tennessee. On January 4, 2005, the trial court entered a consent order modifying the parties' parenting arrangement to designate Husband as the primary residential parent for K. Mother remained the primary

residential parent for daughter A. Father was also ordered to pay Mother $260 per month in child support for daughter A.

After Husband and Mother experienced a series of disagreements about parenting rules for A, then a teenager, Husband agreed to surrender his parental rights as to A. On February 17, 2005, the trial court entered an order recognizing Husband's voluntary surrender of his parental rights as to A. The order modified the parties' parenting plan to require Mother to pay Husband $180 per month in child support for son K. Mother's child support payments were later increased to $335 per month.

Sometime in 2006 or 2007, Husband became suspicious that he might not be K's biological father, based in part on K's evolving appearance. In February 2007, while K was sleeping, Husband swabbed K's cheek; this sample was used to obtain a DNA test. The test results revealed that K is not Husband's biological son.

After keeping the DNA results secret for several weeks, Husband called Mother and told her. Mother responded to Husband that he was "crazy." She then told K about the results of the DNA test. After learning this information, K asked to move back in with Mother, and Husband consented. A second independent DNA test confirmed that Husband is not K's biological father.

After K learned that he and Husband are not biologically related, in an effort to maintain the relationship, Husband told K that he felt that nothing had changed between them. K, however, was no longer comfortable maintaining the father-son relationship with Husband. Consequently, their relationship deteriorated. Subsequent DNA testing revealed that Joey Hay is the biological father of K.

On April 5, 2007, soon after discovering K's true paternity, Mother filed a petition in the trial court, *pro se*, asking the trial court to require Husband to take an independent paternity test to modify the parties' parenting plan to designate her as K's sole residential parent, and to terminate her obligation to pay child support to Husband. On July 2, 2007, Husband filed an answer to Mother's petition. Husband's answer asserted affirmative defenses of fraud, intentional misrepresentation, and negligent misrepresentation, and reserved the right to file a counter-petition.

On July 16, 2007, in light of the DNA test results, the trial court entered an order acknowledging that Husband is not the biological father of K. Mother was designated as the child's sole residential parent and her child support obligation was terminated. All other matters were reserved.

On February 14, 2008, Husband filed a counter-petition against Mother. Husband's petition asserted that, in approximately late 1991, when Mother told him she was pregnant, he "asked [Mother] if she was sure the baby was his. She falsely responded by saying that the baby could be no on else's and that he was the father." In reliance on Mother's misrepresentation, Husband averred, he married Mother, raised the child as his own, and underwent a vasectomy in the belief that he had a child and did not want more. After the parties' divorce, in continued reliance on her misrepresentation, Husband's petition asserted, he paid Mother child support and continued caring for the child. The petition alleged that, "as a direct and proximate result of the intentional and[/]or negligent misrepresentation of [Mother] . . . . he suffered substantial damages." Husband sought compensatory damages of $150,000 and punitive damages of $150,000.

Mother hired a lawyer and filed a response to Husband's petition. In response, Mother denied that Husband inquired about the paternity of her child before they were married and that she falsely represented to Husband that the child was his. She averred that she herself believed that Husband was K's biological father until the 2007 DNA test proved otherwise. Therefore, Mother claimed, she did not intentionally or negligently misrepresent to Husband that he was the father of the child. Mother denied liability for any damage suffered by Husband.

A bench trial was conducted on March 24, 2009.[1] The underlying facts, as set forth above, were largely undisputed. The primary disputed facts concerned the representations made by Mother to Husband in 1991 about K's true paternity, and the ensuing damages suffered by Husband.

Husband testified at the outset. He stated that, when Mother told him she was pregnant in 1991, he asked her directly, "Are you sure it's mine?" Husband testified that Mother's response to this question was "yes." Husband said that he believed and trusted Mother, and during the marriage they never again spoke about the possibility that K could have been fathered by someone else. Had he known there was a possibility that the child was not his, Father said, he would have obtained a paternity test.

Mother also testified about the 1991 events. She said that she had had sexual relations with Joey Hay only one time. Afterwards, concerned that she might be pregnant, Mother told Hay of her concern and took an early pregnancy test, which was negative. In light of the negative pregnancy test, she told Hay she was not pregnant and not to "worry about it." Mother acknowledged that she never told Husband that she had ever had sexual intercourse with Hay.

---

[1]Although Husband initially requested a jury trial, the parties later agreed to waive a jury.

Mother stated that, in view of the negative result from that pregnancy test, it "never crossed her mind" that her later positive pregnancy test was the result of her encounter with Hay. After Mother and Husband were again "together," and the second pregnancy test turned out to be positive, Mother said, she simply assumed it was Husband's child. She denied that Husband asked her whether the child was his, or that she ever had a conversation with him on the subject.

Mother claimed that she never suspected that Husband was not K's father until Husband called her in 2007 with the DNA test results. She said that she did not initially believe that the test result was true. When she told K that Husband is not his biological father, the child was very upset and confused. Both Mother and Husband testified that, as of the time of trial, Husband and K were estranged.

The child, K, testified at trial briefly. K testified that Husband had been a good father to him. He confirmed that, after Mother told him that Husband is not his biological father, Husband told K that nothing would change and he would always love K. K visited Husband once after that, but as of the trial date had not seen Husband in almost two years. K testified that this was a result of K's choice.

Husband and Stepmother testified about the damages suffered by Husband. Husband testified that, had he known that K was not his biological child, he would never have married Mother, he would not have adopted A and formed a parental bond with her, and he would not have undergone a vasectomy until he had a biological child of his own. He testified that "[i]t hurts to know you'll never have a child, the family name won't be carried on, just – it's just a hurt you can't explain." Husband maintained that he would not have purchased real estate with Mother, and would not have accepted a position as an over-the-road truck driver in 1999 to earn more money for the family. Stepmother testified that, emotionally, Husband was "devastated" when he realized that, because of his vasectomy, he would never have a child of his own.

Husband testified that, pursuant to the parties' marital dissolution agreement, he paid child support to Mother and also paid for insurance for K and for K's medical expenses. Husband submitted into evidence documents detailing the amount of child support, insurance premiums and medial expenses he had paid on behalf of K. No evidence was introduced as to the amount of any other pecuniary losses suffered by Husband.

At the conclusion of the testimony, the parties' attorneys argued briefly. Counsel for Mother cited to the trial court caselaw to the effect that a valid child support order is not subject to retroactive modification, including *Rutledge v. Barrett*, 802 S.W.2d 604, 606 (Tenn. 1991),

and *State ex rel. Whitley v. Lewis*, 244 S.W.3d 824, 830 (Tenn. Ct. App. 2007). The trial court then took the case under advisement.

## TRIAL COURT DECISION

On April 3, 2009, the trial court entered an order concluding that Mother had intentionally misrepresented K's paternity to Husband. The trial court specifically credited Husband's testimony and found that Mother's "credibility . . . leaves much to be desired." Based on this credibility determination, the trial court found as a matter of fact that, when Mother first became pregnant with K, Husband asked Mother "if she was sure the baby was his, to which she replied yes, it could not be anyone else's child and that indeed he was the father." The trial court explained:

> [Mother] knew that she and Joey Hay had sex and she knew there was a possibility that Joey Hay was the father of this unborn child. [Mother] knew the date she had sexual relations with Joey Hay and by doing the math would have known the baby could be born some nine months from the date she and Joey had sex.
>
> The fact that [Mother] did not tell [Husband] about her sex with Joey Hay and allowed [Husband] to do the things he did after being told he was the father clearly shows her fraudulent intent to deceive [Husband] into thinking he was the father. This scheme worked.

The trial court further stated that Mother purposely defrauded Husband and failed to disclose a material fact, that K's real father was Joey Hay. "[S]he practiced that fraud, misrepresentation and failure to disclose a material fact from December 20, 1991 when they married until their divorce February 9, 2001." In reliance on Mother's misrepresentations, the trial court found, Husband married Mother, adopted A, took an undesirable job as a truck driver, underwent a vasectomy, and paid child support after the parties divorced.

Because of Mother's "fraud, intentional misrepresentation, [and] negligent misrepresentation," the trial court awarded a judgment against Mother "for $23,030.24 representing the total child support paid by [Husband] to [Mother], for the child [K] who was not the son of [Husband]; the sum of $2,214.20 representing medical expenses and insurance premiums paid by [Husband] for the child [K]; [and] the sum of $1,181.75 for" healthcare premiums paid by Husband for the benefit of K. The trial court further ordered that Husband "be awarded $100,000 for the emotional distress suffered by the said [Husband] because of the fraud, intentional misrepresentation and negligent misrepresentation of [Mother]."

Husband was also awarded attorney fees of $8,451.71. The trial court denied Mother's motion for a new trial or to alter or amend. Mother now appeals.

**ISSUES ON APPEAL AND STANDARD OF REVIEW**

On appeal, Mother raises several challenges to the trial court decision. First, she contends that the evidence preponderates against the trial court's conclusion that she intentionally or negligently misrepresented K's true parentage to Husband, and that the award to Husband must be overturned on that basis. She also claims that, even if the evidence were sufficient to show that an intentional or negligent misrepresentation had been made, the trial court erred in awarding Husband a judgment for the child support, insurance premiums, and medical expenses he paid for the child, because such an award would constitute an impermissible retroactive modification of a valid support order. In addition, Mother asserts that the trial court erred in awarding Husband $100,000 in damages for emotional distress. She notes that Husband did not plead the tort of intentional or negligent infliction of emotional distress as a basis for recovery and argues that, as a result, any award for such damages was inappropriate. She further asserts that Husband did not submit sufficient proof of any emotional distress damages.

"The standard of review in a non-jury case is *de novo* upon the record with a presumption of correctness attributed to the trial court's findings of fact unless the evidence preponderates to the contrary." ***Curry v. City of Hohenwald***, 223 S.W.3d 289, 291 (Tenn. Ct. App. 2007) (citing ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993)); *see* Tenn. R. App. P. 13(d). To the extent that a trial court's factual determinations were based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). We review issues of law "*de novo* with no presumption of correctness accorded to the courts below." ***Taylor v. Fezell***, 158 S.W.3d 352, 357 (Tenn. 2005) (citing ***State v. Yoreck***, 133 S.W.3d 606, 609 (Tenn. 2004)).

**ANALYSIS**

**Sufficiency of the Evidence for Fraudulent/Negligent Misrepresentation**

In this case, Husband asserted, and the trial court found, that Mother negligently, intentionally, or fraudulently misrepresented to Husband that he was K's father.[2] On appeal,

---

[2]In the trial court and, to some extent on appeal, Mother argues that the trial court erred in finding that she committed "fraud," because Husband did not include an allegation of fraud in his complaint. In our view,

(continued...)

Mother argues that the evidence at trial does not support the trial court's finding. She points out that the trial court based its decision on Husband's testimony as to a single conversation in 1991, in which Husband said that he asked Mother whether he was the father of the child, and Mother responded in the affirmative. This evidence, she asserts, was disputed by Mother's testimony that this conversation never took place. She also points to her testimony that she took a pregnancy test after her encounter with Joey Hay, and the result of that test was negative. Based on this negative test result, Mother claims, she reasonably believed that Hay was not the father of K, and she reasonably assumed that Husband must be the father of the child. Thus, when the evidence is viewed as a whole, Mother argues, the preponderance of the evidence weighs against the trial court's finding that she negligently, intentionally, or fraudulently misrepresented K's paternity to Husband.

To establish a claim based on an intentional or negligent misrepresentation, the claimant must first establish that a misrepresentation was made knowing it was not true or without using reasonable care to determine its veracity.[3] *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008) (intentional misrepresentation); *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991) (negligent misrepresentation). In concluding that Mother had made an intentional misrepresentation to Husband in the instant case, the trial court explicitly credited Husband's testimony and discredited Mother's contrary testimony. As noted above, the trial court's findings based on its determination as to witnesses' credibility will not be reversed absent clear and convincing evidence to the contrary. *See Jones*, 92 S.W.3d at 838.

In this case, there is no such clear and convincing evidence to the contrary. Mother testified that she had always assumed that K was fathered by Husband, and that "it never crossed her mind" that the child might have been fathered by Joey Hay. The evidence at trial fully supports the trial court's finding that this assertion was not credible. Moreover, the evidence also supports the trial court's finding that, under the circumstances, Mother had a duty to disclose to Husband that Hay might be the father of the child she was carrying, and that

---

[2](...continued)

however, the trial court's use of the term "fraud" was simply another way of articulating its finding of intentional misrepresentation. Terms such as "intentional misrepresentation," "fraudulent misrepresentation," and "fraud" are frequently used interchangeably because the terms are synonymous under most circumstances. *See Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 904 n.1 (Tenn. 1999). Therefore, we reject Mother's argument in this regard.

[3]Tennessee courts "recognize[] three distinct actions in tort based on misrepresentation: fraud and deceit; strict liability . . .; and negligent misrepresentation under Section 552 of the Restatement." *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 130 (Tenn. 1995); *Harrision v. Avalon Props., LLC*, 246 S.W.3d 587, 600 (Tenn. Ct. App. 2007) (quoting *Robinson v. Omer*, 952 S.W.2d 423, 426-27 (Tenn. 1997).

Mother intentionally failed to disclose this material fact. "[A] party may be found liable for damages caused by his or her failure to disclose material facts to the same extent that the party may be held liable for damages caused by fraudulent or negligent misrepresentations." *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009). Mother's indication to Husband that the child was his, coupled with her failure to inform him of her recent encounter with Hay, constitutes "active concealment" that is the legal equivalent of a positive misrepresentation. *See* 37 Am. Jur. 2d *Fraud and Deceit* § 233 (2001). Giving appropriate deference on appeal to the trial court's assessment of the credibility of both Mother and Husband, we find that a preponderance of the evidence supports the trial court's finding that Mother made an intentional misrepresentation to Husband that the child she was carrying was his and could have been fathered by no one else but him.

### Damages for Past Child Support Payments[4]

On appeal, Mother argues that the trial court's award to Husband of compensatory damages for the child support, medical expenses, and insurance premiums that he paid on behalf of K must be reversed. Regardless of the legal theory on which Husband relies, Mother argues, such an award amounts to a retroactive modification of a valid child support order, which is not permitted under Tennessee law. In support, Mother cites the cases cited to the trial court, namely, *Rutledge v. Barrett*, 802 S.W.2d 604 (Tenn. 1991), and *State ex rel. Whitley v. Lewis*, 244 S.W.3d 824 (Tenn. Ct. App. 2007).

In response, Husband argues that the trial court's damage award in this case was not a retroactive modification of a child support order. Husband points out that the Court in *Whitley* stated in a footnote that it expressed no opinion about any cause of action that the putative father might assert against the mother in a forum other than the juvenile court. He claims that no Tennessee appellate court has ruled that reimbursement of wrongfully paid child support is impermissible.

_____

[4]In Mother's *pro se* petition for full parenting rights, she did not request that Husband be disestablished as K's legal father; she merely asked that the parenting plan be modified to designate her as the primary or sole residential parent, and that her child support obligation be terminated accordingly. She did not request that Husband, as the legal father, be required to continue to support K. Likewise, Husband's counter-petition did not ask that he be disestablished as K's legal father. Currently in Tennessee, the legal paternity of a child is determined in accordance with rebuttable presumptions set out by statute, and a father's paternal obligations arise out of these presumptions. *See* T.C.A. 36-2-304 (2005). Husband may remain K's legal father even though he is not K's biological father, so long as his paternity is not disestablished. *See, e.g.,* *Evans v. Steelman*, 970 S.W.2d 431, 434 (Tenn. 1998). Consequently, while the trial court did not disestablish Husband as K's legal father, it did not order that Husband pay support for K. For this reason, Husband's prospective obligation to support K was never at issue in the trial court and is not the subject of dispute in this appeal.

In this case, Husband paid child support, medical expenses, and insurance premiums for K pursuant to the parties' marital dissolution agreement, which was incorporated into the final decree of divorce. A portion of the trial court's award of compensatory damages explicitly represented the amounts paid by Husband pursuant to the final divorce decree and the ensuing amended child support orders.

Tennessee Code Annotated § 36-5-101(f)(1) provides:

Any order for child support shall be a judgment entitled to be enforced as any other judgment of a court of this state, and shall be entitled to full faith and credit in this state and in any other state. *Such judgment shall not be subject to modification as to any time period or any amounts due prior to the date that an action for modification is filed and notice of the action has been mailed to the last known address of the opposing parties.*

T.C.A. § 36-5-101(f)(1) (Supp. 2009) (emphasis added). In *Whitley*, cited by both parties, the mother of the child at issue had fraudulently induced the putative father into signing a voluntary acknowledgement of paternity, and a child support order was entered. After a paternity test later showed that he was not the biological father, the juvenile court forgave all past child support arrearages and awarded damages in the amount of the child support erroneously paid. *Whitley*, 244 S.W.3d at 825. The State, on behalf of the mother, appealed.

On appeal, the *Whitley* court explained the effect of the above-quoted statute, as interpreted by our Supreme Court in the *Rutledge* decision:

Prior to the 1987 amendment of Section 36-5-101, retroactive modification of a child support order was permitted where it was necessary "to meet the ends of justice." *Rutledge v. Barrett*, 802 S.W.2d 604, 606 (Tenn. 1991). As amended, however, the statute makes no provision for such a modification. The Tennessee Supreme Court has held, applying the plain language of this statute, that a valid child support order is not subject to retroactive modification. "[P]rospective modifications can be made, but only after notice" has been provided. *Id.* Therefore, the court has no authority to forgive an accrued child support arrearage . . . .

Moreover, again relying on the plain language of the statute, the Tennessee Supreme Court held that a child support order is not subject to challenge based on equitable defenses such as fraud, because to do so would "defeat the very purpose of the amendment." *Rutledge*, 802 S.W.2d at 607.

*Id.* at 829.

The putative father in *Whitley* argued that the juvenile court did not retroactively modify the child support order; rather, it set the order aside pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure. This characterization was rejected:

> This argument, however, is based more on semantics than substance; the effect of the Juvenile Court's action in this case is to absolve Lewis of responsibility for the arrearage, contrary to the explicit language of the statute. Indeed, applying *Rutledge*, this Court has held that a child support obligor who is later determined not to be the biological father of a child whom he has been ordered to support may not obtain retroactive relief of the valid child support order by having the order set aside under the provisions of Rule 60.02. *See In re T.S.R.*, No. W2003-01321-COA-R3-JV, 2004 WL 1361359, at *3 (Tenn. Ct. App. June 17, 2004); *State ex rel. Phillips v. Phillips*, No. E2001-02081-COA-R3-CV, 2002 WL 31662544, *2-*3 (Tenn. Ct. App. Nov.26, 2002). As the *Rutledge* Court recognized, the effect of the statute may "seem harsh," but its purpose is to ensure that children receive adequate support. *Rutledge*, 802 S.W.2d at 607.

*Id.* at 829-30. Accordingly, the *Whitley* Court held that the juvenile court lacked the authority to forgive the child support arrearage prior to the date on which he filed a motion for relief from the support order. *Id.* at 830. As to the award of compensatory damages, the *Whitley* court held that the juvenile court did not have jurisdiction to hear such a claim. *Id.* at 831.

In the case at bar, Husband had no child support arrearage; instead, the trial court awarded Husband compensatory damages in the amount of the support he had paid. This represented, as characterized in Husband's appellate brief, "reimbursement for wrongfully paid child support." Husband maintains that the trial court's damage award is not in effect a retroactive modification of the child support award. We must respectfully disagree. In this case, the child support had already been paid, while in *Whitley*, the arrearage remained unpaid. This factual distinction does not render the reasoning in *Whitley* and the cases cited therein inapplicable. The effect of the trial court's award of damages in the amount of the child support and related payments is "to absolve [Husband] of responsibility" for the payments

-11-

required under the prior child support order, in effect retroactively modifying the order. This is clearly contrary to the language in Section 36-5-101(f)(1) and to the holding in *Rutledge* and its progeny.

Thus, regardless of the theory of recovery asserted by Husband, we must conclude that the trial court was without authority to award compensatory damages in amounts correlating to the child support, medical expenses, and insurance premiums paid by Husband pursuant to the earlier child support orders in this cause. Accordingly, this portion of the trial court's award of compensatory damages must be reversed.

### Damages for Emotional Distress[5]

We next address Mother's argument that Husband did not assert the tort of intentional or negligent infliction of emotional distress, and that, therefore, any award of damages for emotional distress is inappropriate. Mother notes that Husband did not plead or prove the elements of the tort of intentional or negligent infliction of emotional distress in his counter-claim. Furthermore, she notes, he did not submit any evidence to establish that he suffered emotional distress other than his own testimony. Consequently, Mother argues, the award of damages for emotional distress should be reversed.

In response, Husband notes that, in a case involving fraudulent misrepresentation, the party asserting the claim must prove a loss or injury as a result of the misrepresentation, and that the measure of damages for fraud is to compensate the injured party by placing him in the same position he would have been had the fraud not occurred. Compensating him for the emotional distress he suffered as a result of the misrepresentation about K's paternity, he argues, is a part of those damages. In support, Husband cites *Harrogate Corporation v. Systems Sales Corporation*, 915 S.W.2d 812, 817 (Tenn. Ct. App. 1995), and *Youngblood v. Wall*, 815 S.W.2d 512, 518 (Tenn. Ct. App. 1991). Thus, he asserts that the trial judge's award of damages was proper.

We reiterate that the trial court awarded Husband compensatory damages for (1) his payments of child support, medical expenses, and insurance premiums for K, and (2) his

---

[5]At oral argument, the Court directed the parties to file supplemental briefs on the issue of whether the chancery court had subject matter jurisdiction to award damages for emotional distress, which are classified as unliquidated damages. *See* T.C.A. § 16-11-102(a) (2009). After considering the parties' supplemental briefs, we are satisfied that, because no objection to the chancery court's jurisdiction to award emotional distress damages was made, the chancery court below properly considered the matter "upon the principles of a court of law." T.C.A. § 16-11-102(b).

emotional distress.[6]   We held above that the trial court was without authority to award compensatory damages against Mother to essentially reimburse him for child support-related payments, as this constitutes an impermissible retroactive modification of the child support order.  This leaves the remaining award of $100,000 for Husband's emotional distress, and the accompanying attorney fee award.

Under the overall heading of "Misrepresentation and Nondisclosure Causing Pecuniary Loss," the general rule for the tort of fraudulent misrepresentation is stated in the RESTATEMENT (SECOND) OF TORTS as follows:

> One who makes a fraudulent misrepresentation is subject to liability to the persons . . . whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for *pecuniary loss* suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

RESTATEMENT (SECOND) OF TORTS § 531 (1977) (emphasis added).  Section 552 of the RESTATEMENT (SECOND) OF TORTS, cited in ***Ritter v. Custom Chemicides, Inc.***, 912 S.W.2d 128 (Tenn. 1995), describes the tort of negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for *pecuniary loss* caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(1) (1977) (emphasis added); ***Ritter***, 912 S.W.2d at 130.  Thus, the RESTATEMENT describes both fraudulent and negligent misrepresentation as subjecting the defendant to liability for "pecuniary loss" caused by the misrepresentation.[7] ***See also*** 37 Am. Jur. 2d *Fraud and Deceit* § 275 ("Proof of damages or a material injury is essential in an action for fraud or deceit, and generally the loss or injury must be a pecuniary injury or an economic loss."); W. PAGE KEETON, PROSSER AND KEETON ON TORTS (5th ed.) (1984) § 105, at 726 (chapter on remedies for misrepresentation "is limited and relates to the

---

[6]Punitive damages were requested in Husband's counter-petition, but they were not awarded by the trial court.

[7]Section 551 of the RESTATEMENT (SECOND) OF TORTS describes liability for nondisclosure in similar terms. ***See*** RESTATEMENT (SECOND) OF TORTS § 551 (1977).

extent to which tort actions are available to protect intangible economic interests of those who are induced by mistake to enter into bargaining transactions as a consequence of a fraud [or] misrepresentation of others").

As the United States Supreme Court has explained, the cause of action arising from misrepresentation is an economic tort:

> Many familiar forms of negligent conduct may be said to involve an element of "misrepresentation," in the generic sense of that word, but "(s)o far as misrepresentation has been treated as giving rise in and of itself to a distinct cause of action in tort, it has been identified with the common law action of deceit," and has been confined "very largely to the invasion of interests of a financial or commercial character, in the course of business dealings."

*United States v. Neustadt*, 366 U.S. 696, 711 n.26 (1961) (quoting W. PROSSER, TORTS § 85, *Remedies for Misrepresentation*, at 702-03 (1941)).   The actions arising out of misrepresentation have remained essentially economic torts:

> Fraud, deceit and negligent misrepresentation are economic torts. Although the invasion of an economic interest by tort or by contract breach will often cause the plaintiff personal distress, the interest ordinarily protected in such cases is purely an economic interest and does not include interests in personality. Accordingly, the usual rule is that the plaintiff must show pecuniary loss in misrepresentation cases and *the damages are limited to such pecuniary loss, with no recovery for emotional distress.*

2 Dan B. Dobbs, LAW OF REMEDIES § 9.2(4), at 559-60 (2d ed. 1993) (footnote omitted; emphasis added), *quoted in* **Karas v. Am. Family Ins. Co.**, 33 F.3d 995, 999 (8th Cir. 1994).

Consistent with this line of reasoning, courts in our sister jurisdictions have declined to permit damages for emotional distress as to claims for the tort of fraudulent or negligent misrepresentation, reasoning that other theories of recovery are intended to deal with non-pecuniary damage and are sufficient to do so.  For example, in **Tolliver v. Visiting Nurse Ass'n of Midlands**, 771 N.W.2d 908 (Neb. 2009), an estate filed a lawsuit alleging misrepresentation against a hospice and nurses' association for damages for the decedent's pain and suffering.  The appellate court affirmed the trial court's dismissal of the misrepresentation claim on the grounds that the estate sought damages for only non-pecuniary losses, namely pain and suffering:

> Economic losses can include more than out-of-pocket and benefit-of-the-bargain losses. They include monetary losses for medical expenses, loss of earnings and earning capacity, funeral costs, loss of use of property, costs of repair or replacement, costs of domestic services, loss of employment, and loss of business or employment opportunities. But economic losses are still monetary losses. And nothing in [RESTATEMENT (SECOND) OF TORTS] § 557A or its comments extends a defendant's liability for a fraudulent misrepresentation to noneconomic losses. In contrast to economic losses, noneconomic losses are nonmonetary losses, which include pain, suffering, and other losses that cannot be easily expressed in dollars and cents.

*Tolliver*, 771 N.W.2d at 916 (footnotes omitted). The *Tolliver* court "decline[d] to recognize noneconomic damages for a misrepresentation claim."[8] *Id.* at 917; *see also Balaschak v. Royal Caribbean Cruises, Ltd.*, No. 09-21196-CIV, 2010 WL 457137, at \*3 (S.D. Fla. 2010) ("Regarding negligent misrepresentation, . . . the Court concludes that [the plaintiff] may not recover noneconomic damages under that count.").

Some courts have applied this reasoning in cases involving the misrepresentation of a child's paternity, dismissing claims of negligent misrepresentation because the plaintiff sought only damages for non-pecuniary losses. *See G.A.W., III v. D.M.W.*, 596 N.W.2d 284, 290 (Minn. Ct. App. 1999); *Pickering v. Pickering*, 434 N.W.2d 758, 762 (S.D. 1989). One court addressing the issue held that damages for emotional distress could be awarded only if it were not a stand-alone damage award, stating specifically that, "[a]lthough damages for emotional distress can be recovered in a fraud cause of action, such damages have been allowed only as an aggravation of other damages." *Nagy v. Nagy*, 210 Cal. App. 3d 1262, 1269 (Cal. Ct. App. 1989). The *Nagy* court noted that the putative father had not pled any

---

[8]There appears to be a split of authority on recognizing a claim for fraudulent misrepresentation that results in physical harm. *See Doe v. Dilling*, 888 N.E.2d 24, 36-40 (Ill. 2008) (disallowing non-pecuniary damages for physical harm suffered as a result of the defendants' misrepresentation that the plaintiff's fiancé did not have the HIV virus). Tennessee has recognized that a spouse who claimed to have been infected by a venereal disease by her former spouse during the marriage could bring a lawsuit for her damages based on *negligence,* so long as she established all of the necessary elements of a negligence claim. *Hamblen v. Davidson*, 50 S.W.3d 433, 438 (Tenn. Ct. App. 2000) (noting that "all the jurisdictions which have considered the issue have held that both married and unmarried sexual partners may be liable to each other for transmitting diseases such as the virus which causes herpes"); *see Cardella v. Cardella*, No. M2007-01522-COA-R3-CV, 2008 WL 4367306, at \*2 (Tenn. Ct. App. Sept. 17, 2008) (following *Hamblen*). Section 557A in the RESTATEMENT (SECOND) OF TORTS notes that some jurisdictions have recognized a claim for fraudulent misrepresentation that results in physical harm. *See* RESTATEMENT (SECOND) OF TORTS § 557A (1977). In this appeal, Husband was not awarded compensatory damages for physical harm, so we do not address whether such damages may be awarded for fraudulent or negligent misrepresentation.

-15-

other legally recognizable damages, and so found that damages for emotional distress were not recoverable under his fraud claim. *Id.*

In this appeal, Husband has not cited to this Court any cases from Tennessee or any other jurisdiction in which compensatory damages for only emotional distress were permitted for a claim of fraudulent or negligent misrepresentation. Indeed, the two fraud cases cited by Husband in his appellate brief arose in a business context and involved damages for pecuniary losses. *See Harrogate Corp.*, 915 S.W.2d at 817; *Youngblood*, 815 S.W.2d at 518.

In the instant case, Husband's petition generally sought compensatory damages. Apart from the child support, medical expenses, and insurance premiums, which we have held are not recoverable, Husband's overall actual allegations included matters that undoubtedly involved pecuniary losses, such as the medical expense of the vasectomy, his move from Georgia to Tennessee, and the like. However, the only claims for which dollar amounts were proven at trial were those for the child support-related expenses. Moreover, apart from the damage award representing child support, medical expenses, and insurance premiums paid for K, the only compensatory damages awarded by the trial court were for emotional distress. Therefore, we are left with an award of only non-pecuniary damages for Husband's claim of fraudulent or negligent misrepresentation. In accord with the authorities cited above, we must decline to recognize noneconomic damages for a misrepresentation claim. *See Tolliver*, 771 N.W.2d at 917.

A few concluding remarks are in order. Numerous courts in other states have considered claims similar to Husband's under the rubric of "paternity fraud." "Paternity fraud occurs when a mother makes a representation to a man that the child is genetically his own even though she is aware that he is not, or may not be, the father of the child."[9] Stephen A. Sherman, *You Ain't My Baby Daddy: The Problem of Paternity Fraud*, 5 AVE MARIA L. REV. 273, 274 (2007) (footnote omitted). A predominant theory of recovery asserted in such cases is the tort of negligent or intentional infliction of emotional distress or "outrageous conduct,"[10] sometimes coupled with a claim for fraud. *See, e.g.,Nagy v. Nagy*, 210 Cal. App. 3d 1262 (Cal. Ct. App. 1989); *Koelle v. Zwiren*, 672 N.E.2d 868 (Ill. App. Ct. 1996); *see also Steve H. v Wendy S.*, 57 Cal. App. 4th 379 (Cal. Ct. App. 1997).

---

[9]This cause of action has also been called "misrepresentation of biological fatherhood" or "misrepresentation of paternity."

[10]The Tennessee Supreme Court has recognized that the torts of "intentional infliction of emotional distress" and "outrageous conduct" are "simply different names for the same cause of action." *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997).

These paternity fraud cases present important considerations.[11] However, none involve the circumstances presented in this case, namely, a plaintiff who has asserted only claims of fraudulent or negligent misrepresentation, for which he was awarded compensatory damages only for emotional distress. Because we must reverse the trial court's stand-alone award of emotional distress damages as not recognized in connection with a fraudulent or negligent misrepresentation claim, we do not reach the issues discussed in these paternity fraud cases.[12]

## Attorney Fees

For the reasons state above, the entire award of compensatory damages must be reversed. In the absence of an award of compensatory damages, the award to Husband of his attorney fees must also be reversed. Thus, the award of damages to Husband must be reversed in its entirety. All other issues raised on appeal are pretermitted.

## CONCLUSION

The decision of the trial court is reversed and the case is dismissed. Costs on appeal are to be taxed to Appellee Chadwick Craig, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[11]In paternity fraud cases, where a putative father has raised claims based on both fraud and negligent or intentional infliction of emotional distress, courts are divided as to whether to recognize such a cause of action, based on the subject matter involved. Some courts have declared that an action based on paternity fraud should not be recognized based on public policy considerations, focusing on the welfare of the child at issue or the difficulties of involving the court system in such private matters. *See Nagy*, 210 Cal. App. 3d at 1269-70; *Day v. Heller*, 653 N.W.2d 475 (Neb. 2002); *Speer v. Dealy*, 495 N.W.2d 911 (Neb. 1993); *Pickering*, 434 N.W.2d at 761-72; *Koestler v. Pollard*, 471 S.W.2d 7 (Wisc. 1991). Other courts have held that a claim based on paternity fraud is actionable as any other tort claim, either failing to mention the public policy considerations or determining that the interest in compensating the putative father outweighs any potential harm to the child. *See Koelle v. Zwiren*, 672 N.E.2d 868 (Ill. App. 1996); *G.A.W., III v. D.M.W.*, 596 N.W.2d 284 (Minn. Ct. App. 1999); *C.M. v. W.P.*, 726 A.2d 998, 1002-03 (N.J. Super. Ct. 1999); *Miller v. Miller*, 956 P.2d 887 (Okla. 1998).

[12]We do not, for example, express an opinion on whether an award of compensatory damages for pecuniary losses not related to child support would have been affirmed as to Husband's misrepresentation claim; nor do we address whether the compensatory damages for emotional distress would have been affirmed had Husband asserted a tort claim of outrageous conduct/intentional infliction of emotional distress. Neither of these situations is presented in this appeal.